Docket No. 108652.

IN THE
SUPREME COURT
OF
THE STATE OF ILLINOIS

RICHARD P. VANCURA, Appellee, v. PETER KATRIS *et al.*,
(Kinko's Inc., Appellant).

*Opinion filed October 7, 2010.*

JUSTICE GARMAN delivered the judgment of the court, with
opinion.
Chief Justice Fitzgerald and Justices Freeman, Thomas, Kilbride,
Karmeier, and Burke concurred in the judgment and opinion.

**OPINION**

Plaintiff Richard Vancura brought an action against Peter Katris,
Glenn Brown, and Randall Boatwright, alleging that the defendants
had colluded to deprive Vancura of his interest in a mortgage note by
forging Vancura's signature on an assignment of that interest.
Vancura also sued Gustavo Albear, the notary public whose seal was
used to notarize the fraudulent mortgage assignment, and Albear's
employer, Kinko's, Inc. (Kinko's). Relevant to this appeal, the circuit
court of Cook County held a bench trial and found Kinko's liable to
Vancura based on a violation of section 7–102 of the Illinois Notary
Public Act (Act) (5 ILCS 312/7–102 (West 1996)) and a common law
claim based on theories of negligent training and negligent
supervision. The appellate court reversed the finding of liability under
the Act, but it affirmed the judgment of the trial court on the common

law negligence claim. We granted Kinko's petition for leave to appeal pursuant to Supreme Court Rule 315 (210 Ill. 2d R. 315).

Kinko's argues that the common law duty of care for employers of notaries is defined by the Act. Thus, it maintains that where its training and supervision adhered to the standards set forth in the Act, it cannot be liable. Kinko's further asserts that it had no statutory duty to train its notary employees, and therefore that its liability is limited to the scope of its undertaking by the voluntary undertaking doctrine. See *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26, 32 (1992). Plaintiff responds that the Act is not the only source of common law duty for a notary's employer, and that Kinko's training and supervision were negligent regardless of the extent of Kinko's duty.

For the reasons given below, we reverse the trial court's judgment against Kinko's and remand with directions to enter judgment in favor of Kinko's on both counts.

BACKGROUND

Plaintiff Vancura, a real estate investor, agreed to help defendant Glenn Brown finance the purchase and rehabilitation of a single-family home in Wheaton, Illinois, as an investment. Vancura loaned $100,000 to a land trust Brown established, and in return the trust executed a $110,000 installment note that was secured by a first mortgage on the investment property. Brown also personally guaranteed the note. However, Brown had difficulty selling the Wheaton house, and when the note matured he did not have the money to repay Vancura. Vancura and Brown each sought advice from defendant Randall Boatwright, another real estate investor, who offered suggestions on how to improve the property. Boatwright then left town to look for investors for his own project, a new video transmission company called Multi Path Communications.

When Boatwright returned from his trip, his business partner, Robert Brown, told him that Vancura was willing to trade the installment note for a share of Multi Path Communications.[1]

---

[1]Robert Brown was not a party to this case, nor did he appear as a witness; the record does not explain his absence. To avoid confusion, we refer to Robert Brown and Glenn Brown, who are not related, with their first

Boatwright told Glenn Brown about the potential trade with Vancura and offered to accept $90,000 in payment for the note, which was then worth $117,333. Glenn Brown then asked another business acquaintance, defendant Peter Katris, to pay Boatwright in exchange for $90,000 and half of the profits from the sale of the Wheaton house, whenever that occurred. Katris agreed, and Glenn Brown arranged for his attorney, Karl Park, to conduct a real estate closing to reflect the transactions. Thus, Glenn Brown understood that Vancura would receive a share of Multi Path Communications and in return he would assign the installment note and accompanying mortgage to Boatwright, who would accept $90,000 in satisfaction of both. Glenn Brown then paid the $90,000 to Boatwright with money borrowed from Peter Katris, whom Glenn Brown repaid with $90,000, plus half of the profits from the sale of the house.

Prior to the closing, Park drafted an "Assignment of Mortgage" for Vancura to sign, along with a loan discount agreement for Boatwright and Glenn Brown to sign and a release deed for Boatwright to sign. According to Boatwright, against whom a default judgment was entered in this case and who testified by way of an evidence deposition, Robert Brown took the assignment of mortgage to Vancura for his signature the night before the closing. When Boatwright and Robert Brown met the next morning, they realized that the assignment of mortgage and the release deed required notarization, and they took the documents to the Kinko's store in Oak Lawn, Illinois. Later, when the closing was conducted, both the assignment of mortgage and the release deed bore the apparent signature and notary seal of Kinko's employee Gustavo D. Albear, an Illinois notary.

At the bench trial in this case, it was undisputed that Vancura never signed the mortgage assignment, and he was not present when the document was notarized. According to Boatwright, when he and Robert Brown arrived at the Oak Lawn Kinko's, he went to make some photocopies while Robert Brown greeted an employee he knew as "Gus." When Boatwright approached Gus and Robert Brown at the counter, the employee asked for Boatwright's driver's license.

---

names.

Boatwright provided his license, and Gus notarized the release deed bearing Boatwright's signature. Boatwright did not remember whether he signed the deed in Gus's presence. Boatwright claimed to know nothing about how the mortgage assignment bearing Vancura's forged signature was notarized.

At the trial, 10 years after the occurrence, Gustavo Albear, the Kinko's employee whose notary seal appears on the notarizations, testified that he did not remember specifically notarizing the assignment of mortgage or the release deed. When presented with both documents, he acknowledged that the notary stamp on each appeared to be his. Similarly, he testified that the signature on the release deed appeared to be his. However, he was "pretty certain" that the notary signature on the forged assignment of mortgage was not his. According to Albear, the two signatures appeared slightly different from one another, and the assignment of mortgage signature read "Gustavo David Albear" rather than "Gustavo D. Albear." Albear explained that he never signed anything with his middle name "for some private reasons and religious reasons," and that he had not used his middle name for an official purpose since he had become a United States citizen.[2] Albear also testified that he had kept a logbook of all notarizations he performed while working for Kinko's, but that logbook could not be located for trial.

The closing occurred as planned, and when Vancura discovered the fraudulent mortgage assignment, he brought suit against Boatwright, Glenn Brown, Katris, Albear, and Kinko's. Glenn Brown and Katris also filed claims against Albear and Kinko's. Only the claims against Kinko's are at issue in this appeal, and we therefore review only the facts that are relevant to those claims.

Each of the three complaints against Kinko's included a claim based on common law theories of negligent supervision and negligent training, as well as a claim based on section 7–102 of the Illinois Notary Public Act (5 ILCS 312/7–102 (West 1996)). Section 7–102 provides:

> "§7–102. Liability of Employer of Notary. The employer of a notary public is also liable to the persons involved for all

---

[2] Albear's seal, which appears on both the assignment of mortgage and the release deed, lists his name as simply "Gustavo Albear."

damages caused by the notary's official misconduct, if:

    (a) the notary public was acting within the scope of the notary's employment at the time the notary engaged in the official misconduct; and

    (b) the employer consented to the notary public's official misconduct." 5 ILCS 312/7–102 (West 1996).

"Official misconduct" under the Act is defined in section 7–104:

    "The term 'official misconduct' generally means the wrongful exercise of a power or the wrongful performance of a duty and is fully defined in Section 33–3 of the Criminal Code of 1961. The term 'wrongful' as used in the definition of official misconduct means unauthorized, unlawful, abusive, negligent, reckless, or injurious." 5 ILCS 312/7–104 (West 1996).

Albear, who settled with Vancura before trial, testified that he became a notary at the request of Kinko's in 1995, and participated in a required notary training course taught by a Kinko's trainer. According to Albear, he learned at the training that there were three types of notarizations. First, "notarization through identification, a card or some type of written identification"; second, notarization of a person known personally to Albear; and third, notarization based on an identification made by someone known personally to Albear. However, Albear testified that he always requested identification to "feel comfortable with a situation." According to Albear, Kinko's taught him to ask for identification with a signature, but the identification need not include a photograph. When asked how an identification with a signature but no photo would enable him to verify that the bearer of the identifying document was the person he claimed to be, Albear responded, "Well, that is not my job. My job is to verify your signature based on what I have in front of me."

With respect to the training program itself, Albear testified that it was a two- or three-day program that was "more marketing than anything else." The instructor taught Albear to keep a logbook of his notarizations, and Albear did. He was also instructed to keep his notary seal and logbook safe, so Albear arranged to keep his materials in the manager's desk at the Oak Lawn Kinko's when they were not in use. Neither the office nor the drawer in which he kept his seal and logbook were consistently locked, but if either or both of them were

locked, Albear would have to ask a manager to open them if a notarization was requested. Although the layout of the Oak Lawn Kinko's was "[v]ery open," the manager's office was the most secure part of the store. Albear also testified that when he transferred to a different Kinko's store in early 1996, he turned his seal and spiral-bound logbook over to the Oak Lawn manager.

Daniel Behnke, who was the manager of the Oak Lawn Kinko's in 1995, denied taking possession of Albear's notary seal or logbook. He testified that the Oak Lawn store employed two or three notaries at the time, including Albear, and that he did not review any notary acts. He also stated that the store never received any complaints or allegations of improper notarizations, nor was he ever asked to approve any notarizations. He agreed with Albear that the manager's desk was the most secure part of the Oak Lawn facility.

Al Yamnitz testified that he was a regional training manager at Kinko's in 1995, and he developed and conducted Albear's notary training. Prior to working at Kinko's, Yamnitz had been a trainer at a number of restaurants and retail stores, including Walgreens and T.J. Maxx. Although he was not a notary, Yamnitz was asked to develop a notary training program for employees who elected to become part of Kinko's new notary service in mid-1995. He reviewed the Act and obtained a copy of the Notary Public Handbook from the Illinois Secretary of State's office. Using these materials, Yamnitz created a teaching manual for the notary class and a student workbook. He also purchased three videotapes from the National Notary Association for use in the training. When he had completed his development of the training program, he sent a copy of his materials to Kinko's corporate offices, but he did not hear back from them. After he had developed the class, Yamnitz also put in a request to attend a "traveling shelf" notary training program at a cost of $300 or $400, but his request was denied.

Yamnitz told the court that the classes he taught consisted of lectures, the videos, and class discussions about "different aspects of notarial acts." He "typically" taught students to identify people on the basis of "a state ID, driver's license, or some type of ID that had a picture, a description, and the signature on it." Although he testified that he taught students to look for a photo, he acknowledged that he also taught them that only one form of identification was required. Yamnitz also recommended that students keep logbooks of their

-6-

notarial acts. With respect to the security of the logbook and seal, Yamnitz stated that he told students, "[I]f they were in the store, they should keep the stamp on their person ***. When they left the building, if they didn't have a place they could lock it up, take it with them because they were the ones that [were] responsible for what was in the book." On cross-examination, Yamnitz also acknowledged that the class was not graded, and no testing was performed to ensure comprehension.

Vancura also presented the testimony of Michael Closen, an expert on notary law and practice. Closen, a licensed Illinois attorney, retired from John Marshall Law School after 27 years. He is a member of the National Notary Association, and he served on the drafting committees for the Notary Code of Professional Responsibility and the Model Notary Act of 2002. Closen has written extensively on the subject of notary law and practice, and he served as an Illinois notary from approximately 1990 until he left the state in 2003.

Closen testified that, in his expert opinion, the standard of care for notaries is "reasonableness," and Kinko's training of Albear was inadequate in a number of ways. According to Closen, there were only two prevailing views about the proper way to identify a document signer in 1995. In one view, only one form of identification was required, but that identification needed to include at least a signature and a photograph. In the other view, adopted by the Model Notary Act of 1984, two or more forms of identification were required, at least one of which needed to include a signature, photograph, and physical description. Closen opined that Illinois had adopted the latter view, pointing to the version of the Illinois Notary Public Act in force in 1995. The relevant portion of that statute stated:

> "A notary public has satisfactory evidence that a person is the person whose true signature is on a document if that person:
>
>> (1) is personally known to the notary;
>>
>> (2) is identified upon the oath or affirmation of a credible witness personally known to the notary; or
>>
>> (3) is identified on the basis of *identification documents*." (Emphasis added.) 5 ILCS 312/6–102(d) (West 1996).

According to Closen, the plural "documents" means that more than

one form of identifying document was required.[3]

Based on his review of the depositions of Albear and Yamnitz and a summary of Albear's trial testimony, Closen concluded that Yamnitz was "unqualified and unfamiliar with sound notary practice." He noted that Yamnitz apparently emphasized the need for just one form of identification with a signature, but "more importantly" he found Albear's focus on the signature alone troubling. Based on Albear's testimony, Closen speculated that Albear would not have paid any attention to a photo or physical description even if one had been provided.

Closen also found that the training and supervision of Albear was deficient with respect to the format and contents of the notary logbook Albear kept. According to Closen, a spiral-bound notebook was an unacceptable format for a notary logbook, because pages could easily be removed. He testified that the information Albear recorded about each notarization was also "woefully incomplete," in that Albear did not require signers to sign the logbook. In addition, Closen noted that the logbook should be kept in a secure location, and the manager's office in which Albear kept his logbook was not sufficiently secure. Closen also opined that Albear had not been properly trained on the disposal of his seal and logbook. For support, Closen noted that Albear had simply turned the notary seal over to his manager when he left the Oak Lawn store, rather than defacing or destroying the seal.

After seven days of trial proceedings held between September 2005 and January 2006, the court found defendants jointly and severally liable to Vancura for the damages. Relevant to this appeal, the court found Kinko's liable to Vancura, Glenn Brown, and Katris under both the statutory and common law claims.

The appellate court reversed in part and affirmed in part, with one justice dissenting. 391 Ill. App. 3d 350. With respect to the statutory claim, the majority concluded that "the material facts regarding Albear's conduct are undisputed." 391 Ill. App. 3d at 365. It noted Kinko's acknowledgment that either Albear notarized Vancura's

---

[3]Although Kinko's twice unsuccessfully moved to exclude Closen's testimony about the proper interpretation of the statute, it has not pursued this issue on appeal.

-8-

signature despite Vancura's absence, or Albear knowingly or unknowingly allowed someone to apply his notary stamp. Under either scenario, the court reasoned, Albear was guilty of negligent or reckless conduct sufficient to constitute "official misconduct" under section 7–104 of the Act. However, the court found that Kinko's did not "consent" to Albear's official misconduct, and therefore the court rejected the trial court's determination that Kinko's was liable under the Act. 391 Ill. App. 3d at 379-80.

With respect to the common law claim, the majority initially found that Kinko's had waived review by failing to cite relevant authority, in violation of Supreme Court Rule 341(h)(7)[4] (210 Ill. 2d R. 341(h)(7)). 391 Ill. App. 3d at 368. Nonetheless, the majority conducted an extensive review of the common law theories, concluding that "the negligence judgment is consistent with the manifest weight of the evidence," and that it would have affirmed even if Kinko's had complied with the rule. 391 Ill. App. 3d at 369.

The majority agreed with Kinko's that Kinko's was under no statutory obligation to train its notary employees, but noted that Kinko's chose to provide training and then showed "no concern" for whether the training was sufficient. 391 Ill. App. 3d at 369. According to the court, the evidence showed that Yamnitz did not effectively train Albear in sound notary practices; although Yamnitz testified that the training he developed was consistent with the Act and the Notary Public Handbook, the court found that Albear's clear misapprehension of his duties conflicted with Yamnitz's claims. The court noted that Albear asked customers to "swear or affirm" that they were who they claimed to be, although the Act includes no such identification process. The court also addressed Albear's testimony that a photographic identification was not required, opining without reference: "In this day and age, an adequate identification document under the circumstances is one that includes at least a photograph and signature." 391 Ill. App. 3d at 371. The majority pointed out that its opinion on this matter was consistent with the Model Notary Act of 1984. It also referred to the comments to the 2002 Model Notary Act, which it called "particularly pertinent" to this case. The majority

---

[4]The appellate court opinion cites Rule 341(e)(7), the provisions of which became Rule 341(h)(7) in 2006. We refer to the current version of the rule.

expressly declined to comment on whether, as Professor Closen testified, two forms of identification were required by the Act in 1995. Instead, it found that Albear's testimony established a practice of accepting an oath or affirmation and "signature exemplar," and such a practice would be insufficient under the Act regardless of whether the law required one or two forms of identification. 391 Ill. App. 3d at 373.

With respect to Kinko's supervision of Albear, the majority found that a reasonably careful employer would have:

> "ensured that supervisory personnel at the Oak Lawn store understood Albear's responsibilities such that they never took possession of his seal at the 24-hour store, that they provided a secure storage place that only Albear could access, and that they refused possession of the seal on a permanent basis when Albear transferred to a Peoria store." 391 Ill. App. 3d at 374.

Thus, the court opined, Kinko's had no regard for whether Albear understood his responsibilities and adhered to them. According to the majority, "[t]his is negligence." 391 Ill. App. 3d at 374.

The dissenting justice would have found that Kinko's was not liable on either the statutory claim or the common law negligent training and supervision claim. Although the dissent agreed with the majority that the common law standard of care was one of "reasonableness," the dissent opined that the Act establishes what is reasonable. 391 Ill. App. 3d at 385 (O'Malley, P.J., dissenting). The dissent criticized the majority and the trial court for relying on the Model Notary Act, noting that the Illinois legislature has declined to adopt the Model Notary Act into either current Illinois notary law or the Act as in effect in 1995. The dissent opined that the scope of Kinko's duties can be defined only by the Act or its own voluntary undertakings.

The dissent also found that Closen's interpretation of the Act was incorrect. According to the dissent, the phrase "identification documents" in section 6–102 of the Act means only that "identification can be ascertained from a variety of different documents that various individuals may present, such as a driver's license, state identification, immigration documents, passport, etc." 391 Ill. App. 3d at 386. Thus, the dissent concluded, Yamnitz's testimony that he trained Albear to require one form of photo

identification demonstrates that Kinko's properly trained Albear.

## ANALYSIS

### Illinois Notary Public Act

Several provisions of the Illinois Notary Public Act are relevant.[5] Although we have already made some references to those provisions, we now reproduce them in full.

Section 6–102 establishes the function and duty of a notary public.

"§ 6–102. Notarial Acts. (a) In taking an acknowledgment, the notary public must determine, either from personal knowledge or from satisfactory evidence, that the person appearing before the notary and making the acknowledgment is the person whose true signature is on the instrument.

(b) In taking a verification upon oath or affirmation, the notary public must determine, either from personal knowledge or from satisfactory evidence, that the person appearing before the notary and making the verification is the person whose true signature is on the statement verified.

(c) In witnessing or attesting a signature, the notary public must determine, either from personal knowledge or from satisfactory evidence, that the signature is that of the person appearing before the notary and named therein.

(d) A notary public has satisfactory evidence that a person is the person whose true signature is on a document if that person:

(1) is personally known to the notary;

(2) is identified upon the oath or affirmation of a credible witness personally known to the notary; or

(3) is identified on the basis of identification documents." 5 ILCS 312/6–102 (West 1996).

Section 7–101 establishes the liability of the notary: "Liability of Notary and Surety. A notary public and the surety on the notary's

---

[5]The Act was substantially amended in 2008. Because the operative facts of this case occurred in 1995 and 1996, we refer to and cite only the version of the Act in effect at that time.

bond are liable to the persons involved for all damages caused by the notary's official misconduct." 5 ILCS 312/7–101 (West 1996).

The vicarious liability of the notary public's employer is set forth in section 7–102:

> "§7–102. Liability of Employer of Notary. The employer of a notary public is also liable to the persons involved for all damages caused by the notary's official misconduct, if:
>
> (a) the notary public was acting within the scope of the notary's employment at the time the notary engaged in the official misconduct; and
>
> (b) the employer consented to the notary public's official misconduct." 5 ILCS 312/7–102 (West 1996).

Section 7–104 defines "official misconduct" as it appears in the above-quoted portions of the Act:

> "§7–104. Official Misconduct Defined. The term 'official misconduct' generally means the wrongful exercise of a power or the wrongful performance of a duty and is fully defined in Section 33–3 of the Criminal Code of 1961. The term 'wrongful' as used in the definition of official misconduct means unauthorized, unlawful, abusive, negligent, reckless, or injurious." 5 ILCS 312/7–104 (West 1996).

Compliance with Supreme Court Rule 341

We first address the appellate court's determination that Kinko's waived review of the common law claim by failing to appropriately support its argument. In reaching that determination, the court briefly reviewed Kinko's arguments. It noted that Kinko's argued the trial court had erroneously expected Albear to be trained to a higher standard than that set forth in the Act, supporting its argument with cases "indicating violation of a statute may be a basis for a tort claim." As the court recognized, Kinko's maintained that it could not be liable for negligence in this case because its training was consistent with the statute. With respect to the negligent-supervision claim, the court opined that Kinko's had cited authority "regarding an entirely different type of tort, negligent hiring and retention of an unfit employee," referring to Kinko's citation to *Van Horne v. Muller*, 185 Ill. 2d 299 (1999).

Supreme Court Rule 341(h) sets out the requirements for appellants' briefs. The rule lists the sections of the brief that shall be included, as well as requirements for each section. With respect to arguments, the rule states that the briefs shall contain:

> "Argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on. Evidence shall not be copied at length, but reference shall be made to the pages of the record on appeal or abstract, if any, where evidence may be found. Citation of numerous authorities in support of the same point is not favored. Points not argued are waived and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." 210 Ill. 2d R. 341(h)(7).

Consistent with the plain language of the rule, this court has repeatedly held that the failure to argue a point in the appellant's opening brief results in forfeiture of the issue. See, *e.g.*, *Elementary School District 159 v. Schiller*, 221 Ill. 2d 130, 143 n.2 (2006) (issue forfeited where it was raised for the first time at oral argument); *Skolnick v. Altheimer & Gray*, 191 Ill. 2d 214, 237 (2000) (affirmative defense forfeited where it was not raised in brief). Both argument and citation to relevant authority are required. An issue that is merely listed or included in a vague allegation of error is not "argued" and will not satisfy the requirements of the rule. See, *e.g.*, *People v. Phillips*, 215 Ill. 2d 554, 565 (2005) (issue forfeited where defendant raised it but failed to make any argument or citation to relevant authority); *People v. Franklin*, 167 Ill. 2d 1, 20 (1995) (issues forfeited where defendant provided no argument to support claims of error); *People v. Guest*, 166 Ill. 2d 381, 413-14 (1995) (one sentence in brief indicating that defendant "incorporated" all claims made in earlier proceedings not sufficient to satisfy Rule 341, resulting in forfeiture of claims). Moreover, an argument that is developed beyond mere list or vague allegation may be insufficient if it does not include citations to authority. See, *e.g.*, *Dillon v. Evanston Hospital*, 199 Ill. 2d 483, 493 (2002) (three-paragraph argument insufficient to satisfy Rule 341 where argument did not include any citations to authority).

The appellate court has further held that even where the brief includes both argument and citation, a party may nonetheless forfeit review if the cited authority is irrelevant and does not represent a

sincere attempt to comply with the rule. See, *e.g.*, *Britt v. Federal Land Bank Ass'n of St. Louis*, 153 Ill. App. 3d 605, 608 (1987) ("We do not view the inclusion of citations to irrelevant authority scattered throughout [the plaintiffs'] brief to constitute even an attempt to comply with the rule"). In the present case, with respect to Kinko's argument on the negligence claims, the court found that "[t]he cited case law has no bearing on the judge's finding of negligence and does not warrant further discussion." Thus, the court concluded, Kinko's forfeited consideration of the argument. 391 Ill. App. 3d at 368.

Kinko's brief to the appellate court contained more than eight pages of argument on the common law claim and citations to 17 cases, along with statutes and secondary authority. Kinko's argued there, as it does here, that the Act governs an employer's duty to train and supervise notary employees, citing cases in which this court and others have discussed the role of statutes in negligence cases. See, *e.g.*, *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252 (1999); *Bier v. Leanna Lakeside Property Ass'n*, 305 Ill. App. 3d 45 (1999). As the appellate court noted, most of Kinko's citations are not directly on point. Instead, the cited cases arise from violations of statutes, and they generally discuss the use of statutory violations as evidence of negligence. See, *e.g.*, *Calloway v. Kinkelaar*, 168 Ill. 2d 312, 319 (1995) ("If the plaintiff is a member of the protected class and his or her injury is of the type the statute was intended to protect against, the plaintiff may recover upon establishing that the defendant's violation of the ordinance or statute proximately caused plaintiff's injury").

With respect to the negligent-supervision claim specifically, Kinko's relied on *Van Horne*, as noted above. In *Van Horne*, the plaintiff alleged that the defendant radio station was vicariously liable and directly liable for damages caused when a disc jockey made defamatory statements about the plaintiff on air. *Van Horne*, 185 Ill. 2d at 303-04. The plaintiff alleged direct liability against the station for defamation based on its publication of the defamatory statements, but the plaintiff also alleged direct liability based on the station's actions as an employer. Under the heading "Negligent and Reckless Hiring, Supervision, and Retention," this court explained that "[c]ounts V through VIII [of the plaintiff's complaint] purport to allege claims for negligent and reckless hiring and negligent and reckless supervision." *Van Horne*, 185 Ill. 2d at 308-09. Specifically, the court noted that the plaintiff alleged "that the defendants had a duty to supervise their disc

-14-

jockeys," along with allegations of negligent hiring and retention. *Van Horne*, 185 Ill. 2d at 310.

In discussion, however, this court focused solely on negligent hiring and retention; the plaintiff's claim of negligent supervision was not separately discussed. Noting that "Illinois law recognizes a cause of action against an employer for negligently hiring, or retaining in its employment, an employee it knew, or should have known, was unfit for the job so as to create a danger of harm to third persons," the *Van Horne* court went on to explain that liability "in this context" arises only when the employee has a "particular unfitness" that gives rise to a "particular danger of harm to third parties." (Emphasis omitted.) *Van Horne*, 185 Ill. 2d at 310, 313. It is this language that Kinko's cited in its brief to the appellate court. While the cited language may be unpersuasive on the issues in this case, we disagree with the appellate court's conclusion that *Van Horne* has "no bearing."

Thus, although we acknowledge that citation to completely irrelevant authority may, in some cases, be so inadequate as to run afoul of Rule 341(h)(7), the case at bar is not such a case. In our view, citation to cases that are merely unpersuasive or inapposite, as the appellate court apparently found Kinko's cited authorities to be, is not tantamount to failing to cite relevant authority altogether. We therefore find that Kinko's has not forfeited review of the common law negligence claim, and we will review it on its merits.

We note that although Rule 341(h)(7) applies on its face only to appellants' briefs before the appellate court, it also applies to appellees' briefs through Rule 341(i) and to briefs before this court through Rule 315 (210 Ill. 2d R. 315). Thus, while Rule 318(a) provides that an appellee may seek and obtain any relief warranted by the record on appeal without filing a separate appeal or petition for leave to appeal (155 Ill. 2d R. 318(a)), Rule 341 nonetheless requires that the appellee provide adequate argument and citation to authority for any such relief.

In his appellee's brief to this court, plaintiff Vancura includes a section entitled "Additional Issue Presented for Review," which reads, in total, "Whether the First District properly vacated the trial court's ruling that Kinko's impliedly consented to its employee's official misconduct in notarizing the forged Assignment of Mortgage." Similarly, plaintiff's "Conclusion" section includes the sentence, "The

First District should not have vacated the trial court's finding that Kinko's was liable for Albear's official misconduct." Aside from these two sentences, however, plaintiff makes no reference to the statutory liability claim and devotes no portion of his argument to supporting that claim. In contrast to the sections of Kinko's brief discussed above, plaintiff's brief contains *no* argument and *no* citations to authority on this point. As discussed above, a claim of error that is merely listed but not "argued" will not satisfy the requirements of Rule 341. See, *e.g.*, *Phillips*, 215 Ill. 2d at 565. We find that plaintiff has failed to comply with our rules, and he has therefore forfeited review of the statutory liability count. Consequently, with respect to the statutory claim, we affirm the appellate court and reverse the trial court's judgment against Kinko's.

## Standard of Review

Plaintiff's remaining claim against Kinko's alleges that Kinko's "negligently trained and supervised and failed to properly control its employee, Albear, resulting in the improper notarization of the Assignment of Mortgage." To succeed in a claim for negligence, a plaintiff must establish the existence of a duty, a breach of the duty, and an injury to the plaintiff that was proximately caused by the breach. *Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228 (2000). Whether a duty exists in a particular case is a question of law, which we review *de novo*. *Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186 (2002); *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 280 (2007). Breach of duty and causation are generally findings of fact, which we will reject only when they are against the manifest weight of the evidence. *Jones v. Chicago & Northwestern Transportation Co.*, 206 Ill. App. 3d 136, 139 (1990); *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 151-52 (2005). A finding is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002).

Although plaintiff formulated his common law claim as a single claim of negligent supervision and negligent training, we note that it in fact raises two distinct theories of negligence on the part of Kinko's: liability for negligent supervision and liability for negligent training. We evaluate each in turn.

Negligent Supervision

The central question we must resolve is whether, in light of general common law principles and the statutory scheme established by the Act, Kinko's can be liable for negligent supervision of Albear. Kinko's, as appellant, begins its argument by conceding that the statutory remedy provided in section 7–102 of the Act does not preempt a common law cause of action for negligent supervision. Instead, Kinko's argues, the Act fixes the measure of the common law duty owed by employers of notaries. Thus, according to Kinko's, an employer cannot be liable on the basis of a duty found outside the Act. Plaintiff responds that although the Act establishes and fixes the duties of a notary public, the statute does not "preempt" a common law cause of action based on the employer's own negligence. Thus, plaintiff maintains, he may assert a common law claim that is unaffected by the statute. Plaintiff relies primarily on general assertions of negligence on the part of Kinko's and the testimony of Professor Closen, described above.

Because plaintiff asserts a common law claim, we note that at common law an employee's malfeasance may generally create liability for his or her employer in two ways: vicarious liability for the acts of the employee, or direct liability for the employer's own acts. Under the theory of vicarious liability, or *respondeat superior*, an employer can be liable for the torts of an employee that are committed within the scope of the employment. *Wright v. City of Danville*, 174 Ill. 2d 391, 405 (1996); *Pyne v. Witmer*, 129 Ill. 2d 351, 359 (1989). The employee's liability is imputed to the employer; that is, where the employee is acting within the scope of the employment, the plaintiff generally need not establish any malfeasance on the part of the employer. See *Darner v. Colby*, 375 Ill. 558, 560 (1941).

In contrast, a claim of direct negligence, such as the plaintiff's claim in this case, alleges that the employer was *itself* negligent. As in any claim for negligence, a plaintiff must establish the existence of a duty, a breach of the duty, and an injury to the plaintiff that was proximately caused by the breach. *Hills*, 195 Ill. 2d at 228. In direct negligence, the plaintiff must prove that the employer's breach–not simply the employee's malfeasance–was a proximate cause of the plaintiff's injury. In a claim of negligent supervision such as the one plaintiff has pleaded in this case, where there is no assertion of a particular duty to supervise, the duty upon which plaintiff relies must

be based on the general relationship between employer and employee. The scope of that duty in this case, however, is the heart of the dispute between the parties.

In support of its argument that the Act alone fixes the scope of the employer's legal duty, Kinko's cites several cases in which Illinois courts have discussed the relationship between statutes designed to protect life or property and negligence actions. See *Noyola v. Board of Education of the City of Chicago*, 179 Ill. 2d 121, 130 (1997); *Dunn v. Baltimore & Ohio R.R. Co.*, 127 Ill. 2d 350, 367 (1989); *Price v. Hickory Point Bank & Trust*, 362 Ill. App. 3d 1211, 1216-17 (2006). Kinko's relies primarily on *Noyola*, citing that case's assertion that "statutes and ordinances designed to protect human life or property establish the standard of conduct required of a reasonable person. [Citation.] In other words, they fix the measure of legal duty." *Noyola*, 179 Ill. 2d at 130. According to Kinko's, the imposition of a standard of care that is higher than that prescribed by the statute violates the principle expressed in *Noyola* and similar cases. We disagree.

In *Noyola*, this court considered whether section 18–8(A)(5)(i)(1)(a) of the School Code, which set forth the manner in which certain school funds could be expended, created an implied cause of action against the defendant school board for failing to comply with the statute. *Noyola*, 179 Ill. 2d at 124-28. The court observed that in the state courts of this country,

> "judges have come to identify the implied statutory action with modern tort actions based on the law of the reasonable person. Their view is that conduct violating legislated rules is negligent, and if a statutory violation proximately causes an injury of the kind the legislature had in mind when it enacted the statute, the offending party is civilly liable for that injury." *Noyola*, 179 Ill. 2d at 129.

"In Illinois," the court noted, "this approach is reflected in those cases holding that the violation of a statute or ordinance designed to protect human life or property is *prima facie* evidence of negligence." *Noyola*, 179 Ill. 2d at 129. Thus, although *Noyola* went on to explain that "statutes and ordinances designed to protect human life or property establish the standard of conduct required of a reasonable person," the court meant only what it asserted in the remainder of the quoted

-18-

paragraph: "Where a defendant *violates* one of these statutes or ordinances, a plaintiff who belongs to the class intended to be protected by that statute or ordinance and whose injury is of the type the statute or ordinance was intended to protect against may recover upon establishing that the defendant's violation proximately caused plaintiff's injury." (Emphasis added.) *Noyola*, 179 Ill. 2d at 130. Kinko's reliance on *Noyola* for the inverse proposition–that is, that *compliance* with a statute precludes a finding of negligence–is misplaced. See, *e.g.*, *Indianapolis & St. Louis R.R. Co. v. Stables*, 62 Ill. 313, 317-18 (1872) ("Because the statute has imposed specified duties, it does not follow that the employees of [railroads] are released from the dictates of humanity or the common legal duty of regarding the rights of others"); *Christou v. Arlington Park-Washington Park Race Tracks Corp.*, 104 Ill. App. 3d 257, 261 (1982) ("Compliance with statutes and safety regulations is not conclusive evidence on the question of negligence"); *Belvidere National Bank & Trust Co. v. Leisher*, 83 Ill. App. 3d 179, 186 (1980) ("Although violation of statutes, ordinances or codes is conclusive to show defendant's breach of duty (leaving only the question of proximate cause), compliance with codes and safety regulations is not conclusive evidence on the question of negligence").

Clearly, then, the mere existence of a statute establishing legal duties for employers of notaries does not foreclose the possibility of a common law negligence action based on an extra-statutory duty of care. However, the legislature may intentionally foreclose or limit such an action through the statute by altering the common law. "A statute will be construed as changing the common law only to the extent the terms thereof warrant, or as necessarily implied from what is expressed." *Cedar Park Cemetery Ass'n v. Cooper*, 408 Ill. 79, 82 (1951). To determine whether the legislature has modified the common law liability of employers of notaries, we first examine the statute.

Section 7–102 establishes a cause of action against the employer of a notary for an employee's official misconduct where: (1) the notary public was acting within the scope of his employment, and (2) the employer consented to the notary's official misconduct. The section is titled "Liability of Employer of Notary." 5 ILCS 312/7–102 (West 1996). With respect to the second prong of the statute, the appellate court concluded that for an employer to be found to have

"consented" to a notary's official misconduct, there must be a showing that the employer had some knowledge of the notary's misconduct. We agree.

Where the language of a statute is clear, it must be given its plain and ordinary meaning. *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 26 (2005). Here, the statute provides that an employer may be found liable for the acts of a notary only where "the employer consented to the notary public's official misconduct." 5 ILCS 312/7–102(b) (West 1996). The statute does not define "consent," but Black's Law Dictionary defines the term in relevant part as "[a]greement, approval, or permission as to some act or purpose." Black's Law Dictionary 323 (8th ed. 2009). Whatever the proof required to establish "consent" on the part of an employer, it is clear that an employer cannot "[a]gree[ ], approv[e], or [grant] permission" for an act or purpose of which the employer has no knowledge.

The legislature therefore intended for the employer of a notary to be liable where the employer has some minimum threshold of knowledge of the notary public's conduct. This represents a clear conflict with common law claims of either *respondeat superior* or direct negligence. A common law vicarious liability claim typically requires no proof of the employer's knowledge, consent, or culpability. See *Alms v. Baum*, 343 Ill. App. 3d 67, 74 (2003) (An action for *respondeat superior*, "is brought against a master based on allegedly negligent acts of the servant[,] and no independent wrong is charged on behalf of the master"). Similarly, in a direct liability claim, the plaintiff may allege that the employer merely *should have* known of the employee's malfeasance. We presume that the legislature was familiar with the common law requirements. See *People v. Hickman*, 163 Ill. 2d 250, 262 (1994) ("it must be presumed that the legislature acted with knowledge of the prevailing case law"). We therefore hold that section 7–102 was intended to modify common law liability for employers of notary publics. Plaintiffs who raise a common law claim against the employer of a notary public must show, at a minimum, that the employer had some knowledge of the notary public's misconduct. In other words, the minimum duty of an employer of notaries at common law extends only as far as the duty established by section 7–102 of the Act; the employer has a duty to not consent to the official misconduct of its employees.

Our conclusion today is consistent with the Act as a whole. The

-20-

Illinois Notary Public Act was enacted "to simplify, clarify, and modernize the law governing notaries public" and to "promote, serve, and protect the public interest." 5 ILCS 312/1–102(b)(1) (West 1996). The office of notary public, however, extends well into common law history. Black's Law Dictionary (9th ed. 2009), citing J. Proffatt, The Office and Duties of Notaries Public §1, at 1 (2d ed. 1892) ("A notary public is an officer long known to the civil law"). Under the Act and common law, the notary public "serves as a public witness of facts transacted by private parties." Black's Law Dictionary (9th ed. 2009), quoting S. Litvinoff, 5 Louisiana Civil Law Treatise: The Law of Obligations 296-97 (2d ed. 2001). Thus, the notary public gives his or her personal seal and signature when completing a notarial act, and in so doing he or she assumes personal liability for the accuracy of his or her notarization. 5 ILCS 312/3–101, 3–102 (West 1996) (setting forth the requirements for the notary's official seal and signature); 5 ILCS 312/6–105 (West 1996) (setting forth the requirements for certificates of notarial acts); 5 ILCS 312/7–101 (West 1996) ("A notary public and the surety on the notary's bond are liable to the persons involved for all damages caused by the notary's official misconduct"). In this way, the Act codifies a long tradition of imposing burdens and liabilities on a notary public that are personal to the notary, rather than shared with his or her employer. Thus, under the Act, when a notary public wrongfully or negligently exercises the powers of the office, it is the notary alone who becomes liable. Under section 7–102, the employer is liable only if the employer "consented to" the misconduct of the notary; that is, if the employer committed some malfeasance of its own.

Applying these holdings to the present case, plaintiff does not argue that Kinko's had any knowledge of Albear's misconduct, nor did the evidence at trial reveal any such knowledge. On the contrary, the evidence established that Kinko's never received any complaints about Albear's conduct as a notary. Plaintiff has claimed only a general negligence in failing to discover defects in Albear's performance. Even if we assume that such allegations establish a cause of action for negligent supervision of an employee generally, section 7–102 makes clear the legislature's intent to require some knowledge on the part of the employer as a prerequisite to imposing liability. Therefore, the judgment of the circuit court imposing liability against Kinko's for negligent supervision must be reversed.

Negligent Training

Plaintiff also alleges that Kinko's was negligent in its training of Albear. Initially, we note that plaintiff has not argued that Kinko's breached a generalized duty to provide training. Instead, plaintiff has alleged that Kinko's was negligent because the training Kinko's did provide was insufficient or defective in several enumerated ways. In other words, although plaintiff acknowledges that Kinko's provided training, it argues that Kinko's did so negligently. Kinko's responds that its liability for training should be limited in light of the voluntary undertaking doctrine, relying on *Frye v. Medicare-Glaser Corp.*, 153 Ill. 2d 26 (1992).

In *Frye*, this court addressed the question of whether a pharmacist who was under no duty to attach warning stickers to dispensed medication could be liable for negligence when she undertook to attach stickers. *Frye*, 153 Ill. 2d at 28-29. The plaintiff alleged that the pharmacist was negligent because she attached a sticker indicating that the medication may cause drowsiness, but she did not attach a sticker indicating that the medication should not be taken with alcohol, although she knew that drinking alcohol with the medication was dangerous. *Frye*, 153 Ill. 2d at 29. This court noted that, although the pharmacist was initially under no duty to warn patients, "[p]ursuant to the voluntary undertaking theory of liability, one who gratuitously or for consideration renders services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care or ' "such competence and skill as [one] possesses." ' " *Frye*, 153 Ill. 2d at 32, quoting *Cross v. Wells Fargo Alarm Services*, 82 Ill. 2d 313, 317 (1980); *Nelson v. Union Wire Rope Corp.*, 31 Ill. 2d 69, 86 (1964). The court also applied section 323 of the Restatement (Second) of Torts, which provides:

"§323. Negligent Performance of Undertaking to Render Services

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of

-22-

such harm, or

> (b) the harm is suffered because of the other's reliance upon the undertaking." Restatement (Second) of Torts §323 (1965).

Kinko's argues that, because it was under no duty to train its notary public employees, the training program it provided should be subject to the provisions of *Frye* and section 323. We disagree for several reasons. First, both the Restatement and *Frye* contemplate the liability of a service provider for the provision of services. In our view, the training of an employee cannot reasonably be viewed as the employer's "render[ing] services" to an employee. Moreover, section 323 and our precedents explicitly limit themselves to situations in which the plaintiff has suffered "physical" or "bodily" harm. In the present case, plaintiff has suffered only economic damages. Finally, section 323 provides for liability of the service provider in favor of the person to whom the services were negligently rendered. Here, even if we could view Kinko's training as providing a service "gratuitously or for consideration," that service was clearly not provided to plaintiff.[6] We therefore reject Kinko's argument that plaintiff's negligent training claim is controlled by *Frye* or section 323 of the Restatement.

Instead, whether and to what extent Kinko's had a duty to train its notary employees is best analyzed under principles generally applicable to negligence cases. As we have stated, whether a duty exists in a particular case is a question of law, which we review *de novo*. *Happel v. Wal-Mart Stores, Inc.*, 199 Ill. 2d 179, 186 (2002), quoting *Ward v. K mart Corp.*, 136 Ill. 2d 132, 140 (1990); *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 280 (2007). "The touchstone of the duty analysis is to ask whether the plaintiff and defendant stood in such a relationship to one another that the law imposes on the defendant an obligation of reasonable conduct for the benefit of the plaintiff." *Krywin v. Chicago Transit Authority*, No. 108888, slip op. at 8 (July

---

[6]Section 324A of the Restatement, which this court applied in *Pippin v. Chicago Housing Authority*, 78 Ill. 2d 204, 210-11 (1979), does provide for limited liability to third persons based on the negligent performance of a service or undertaking. However, like section 323, section 324A provides liability only where the provision of services results in "physical harm," and Kinko's has not claimed that section 324A applies.

15, 2010). The inquiry involves four factors: (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing the burden on the defendant. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 436-37 (2006).

Initially, we note that the Act imposes no duty on the employer of a notary public, except to refrain from consenting to the notary's misconduct, as discussed above. Consistent with the Act's overall emphasis on the personal responsibility of the notary, the notary's employer is not charged with providing training, supplies, or any other assistance to the notary. Indeed, the notary is not required to undergo any special training before or during his or her tenure as a notary. Moreover, plaintiff has not asked us to impose a general duty on employers to train notary employees; as noted above, plaintiff has alleged that Kinko's training was negligent, not that Kinko's breached a general duty to train. We therefore express no opinion on whether a general duty to train exists, and we move instead to defining the scope of the employer's duty once training has been provided.

Plaintiff urges us to adopt a duty would require employers to train notary employees in the best practices of notaries generally, as expressed in Closen's testimony. Closen based his testimony almost entirely on the Model Notary Acts of 1984 and 2002, opining that Kinko's was negligent for failing to teach Albear about several practices required under the Model Acts but not mentioned in the Illinois Notary Public Act, including maintaining a logbook and destroying the notary seal when he resigned his commission. However, the legislature of Illinois has never adopted the Model Notary Act. Though it could have done so when it considered and revised the Act in both 1986 and 2008, it did not enact any of the provisions of the Model Acts into law. The stated purpose of the Act includes "to simplify, clarify, and modernize the law governing notaries public," and the legislature may well have declined some of the more stringent requirements, including those in Closen's testimony, in the interests of simplicity and clarity. 5 ILCS 312/1–102(b) (West 1996). We note also that the Act's reduced requirements makes it easier to obtain a notarization, thus allowing more of the public access to notary services. If we were to impose a duty on employers who provide training that required such training to teach proposed and model standards rather than the standards selected

by our legislature and expressed in the Act, we would be undermining the legislature's careful determination of what should be required of a notary. This we will not do.

Instead, we hold that where an employer provides training to notary public employees, it has a duty to ensure that its training conforms to the provisions adopted by the Illinois legislature in the Act. This holding is consistent with the four factors we have enumerated: (1) the reasonable foreseeability of the injury; (2) the likelihood of the injury; (3) the magnitude of the burden of guarding against the injury; and (4) the consequences of placing the burden on the defendant. First, where an employer trains notaries as part of a program to offer that notary's services to its customers, it is highly foreseeable that errors in the training program could lead to injuries such as those that occurred in this case. With respect to the second factor, where the training is incorrect or misleading, the likelihood of a resultant injury is also relatively high. Notary publics are routinely asked to witness instruments of great legal and financial significance, including loan documents, mortgages, and property transactions. The potential for fraud in such transactions is great, and parties to the transactions rely on the proper performance of the notary. If the employer provides incorrect or inadequate instruction, the potential for injury is present.

Furthermore, where the employer has already undertaken to provide training, the burden imposed on the employer by requiring that the training comply with the Act is minimal. The Act should be the starting point of any training program for notary publics in Illinois, and we expect that any employer who seeks to train Illinois notaries would attempt to conform the training to the Act. The last factor, the consequences of placing this burden on employers of notaries, is similarly not a concern. Although some employers may decide not to provide training programs to their notary employees, notary publics are not required to undergo any training under the Act.

Having determined that once Kinko's undertook training, it had a duty to train its employees consistently with the Act, we next evaluate plaintiff's claim that Kinko's breached its duty. Breach of duty is a finding of fact, which we will reject only when it is against the manifest weight of the evidence. *Corral v. Mervis Industries, Inc.*, 217 Ill. 2d 144, 151-52 (2005). A finding is against the manifest weight of the evidence when an opposite conclusion is apparent or

-25-

when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002).

The trial court found that "Kinko's failed to meet the necessary standard of care." However, it did not directly explain the factual findings that led it to this conclusion. Instead, the court reviewed several portions of Professor Closen's testimony, noting that the testimony was "not impeached" and that Kinko's offered no expert witness of its own. The court specified several ways in which Closen opined that Kinko's failed to meet the standard of care: the instructor of the notary training program, Yamnitz, "was not a notary at the time he trained Albear and had never been a notary"; Yamnitz did not teach Albear "that information regarding notarizations was to be kept in a journal"; Yamnitz did not teach notaries about "steps to take to secure the notary seals and journal"; Yamnitz did not instruct Kinko's notaries "on the need to preserve the notary seal and logbook"; and Yamnitz did not properly train Albear about the procedures for "identifying document signers."[7]

First, Kinko's was not under a duty to provide notary training classes taught exclusively by notaries. As we have stated, all that was required of Kinko's training program was that it teach notaries in a manner consistent with the Act. The credentials of the trainer are therefore irrelevant, so long as he or she teaches the class in conformity with this duty.

With respect to the journal, we note that both Albear and Yamnitz testified that Albear was taught to maintain a journal of his notarizations, and Professor Closen referred to their testimony on the matter when he opined that the journal Albear kept was insufficient. Thus, the court's finding that Kinko's breached its duty by failing to teach Albear to keep a journal is against the manifest weight of the evidence. Even if it were not, however, the Act did not require notaries to maintain a journal or logbook of any kind in 1995. Therefore Kinko's was under no duty to train Albear to keep one.

---

[7]The court also found that Kinko's managers were not trained "in the responsibilities of notaries." Although this is framed in terms of training, plaintiff's argument was that the lack of managerial training was a factor in the negligent supervision of Albear. We therefore need not consider that finding here.

Similarly, Kinko's was under no duty to train its notary employees to secure or preserve the logbook. With respect to the security and preservation of the seal, the Act contains no requirements about either. Although section 7–107 of the Act makes it a misdemeanor to unlawfully possess a notary's seal, the Act makes no command, specific or general, about the need to secure the seal. The Act also contains no requirement that the seal of a notary who resigns his commission be preserved or destroyed, as Closen suggested was required.

Finally, the trial court also found that Kinko's breached its duty because Yamnitz did not properly train Albear about "identifying document signers." Although Professor Closen found several faults with Albear's identification process, the court repeated just one such deficiency in its summary of Closen's testimony: "Albear did not require photo identification from a document signer."

Where the language of a statute is clear, it must be given its plain and ordinary meaning. *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 26 (2005). In addition, the statute "should be read as a whole with all relevant parts considered." *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). As we have already discussed, the notary public gives his or her personal seal and signature when completing a notarial act, and in so doing he or she assumes personal liability for the accuracy of his or her notarization. 5 ILCS 312/3–101, 3–102 (West 1996) (setting forth the requirements for the notary's official seal and signature); 5 ILCS 312/6–105 (West 1996) (setting forth the requirements for certificates of notarial acts); 5 ILCS 312/7–101 (West 1996) ("A notary public and the surety on the notary's bond are liable to the persons involved for all damages caused by the notary's official misconduct").

It is in this context that the Act provides that a notary must determine, "either from personal knowledge or satisfactory evidence," that the person seeking notarization is the person whose true signature is on the document. "Satisfactory evidence" is generally defined as "[e]vidence that is sufficient to satisfy an unprejudiced mind seeking the truth." Black's Law Dictionary 639 (9th ed. 2009). Thus, under the Act a notary public, whose inherent function is to serve as an unprejudiced witness, must satisfy himself of the truth of a signer's identity. The specific manner in which the notary should do so is left to the notary, but as noted above, the Act establishes that a notary

who does so in a negligent or reckless manner has committed "official misconduct" and is liable for any damages so caused. 5 ILCS 312/7–101 (West 1996).

Closen cited the Model Notary Act of 1984 as establishing that a photograph was required, and the appellate court accepted this assertion, noting that Illinois courts have occasionally turned to such persuasive authority to define a statutory term. See *Lohr v. Havens*, 377 Ill. App. 3d 233 (2007); *Hasemann v. White*, 177 Ill. 2d 414 (1997). Thus, the appellate court indicated that reading in the requirements of the Model Notary Act was appropriate to help define "satisfactory evidence." In our view, however, adopting the Model Notary Act's approach in this manner would not merely define "satisfactory evidence," a term that is clear as it is used in the Act, but would instead supply additional requirements not indicated by the statute's plain language. Where the Act did not specify that only photographic identification could provide "satisfactory evidence" of identity, we decline to read in such a requirement.

We therefore find that under the 1991 Illinois Notary Public Act, Albear was not required to obtain photographic identification to have "satisfactory evidence" of a person's identity, and the trial court's reliance on Closen's testimony to the contrary was incorrect as a matter of law. Instead, the Act required Albear to satisfy himself of the signer's identity in a nonnegligent manner, either by personal knowledge or on the basis of "identification documents." As a result, Kinko's was not under a duty to teach its notary employees that a photo identification was required; its duty was simply to teach notaries that they could use identification documents to fulfill their statutory obligation to receive "satisfactory evidence" of identity. The evidence clearly establishes that they did so.

Yamnitz testified that he instructed his notary students to look for a photo, saying:

> "Typically what I told my students or my participants was to ask for a state ID, driver's license, or some type of ID that had a picture, a description, and the signature on it so that they could use a picture to verify, use a description to more or less verify height and weight, and then be able to compare the signature."

Although Albear testified that he was taught a photograph was not

required, he nonetheless corroborated Yamnitz's claim that he was taught to ask for identification. He testified, "I ask for identification. The majority of the times I ask people for a driver's license. If at that time there were driver's licenses with photos on it, that is what I received. If not, then I received other identification." Albear's testimony was corroborated by Boatwright, who testified that on December 20, 1995, when he approached the counter for the notarization of his signature, Albear asked him to show a driver's license.

Albear also testified that Kinko's trained him to make sure the person whose signature he was notarizing was the person appearing before him. When asked "So you wouldn't notarize a signature unless that person was physically in your presence?" Albear responded, "That is the way we were taught." Moreover, although he acknowledged that the Act permitted him to personally identify a signer or to allow a person known to him to swear or affirm an identification, he testified that he always asked for identification because he felt more comfortable that way. He also testified that he asked all of his customers to "swear or affirm" that they were who they claimed to be, because that was his "preference."

Closen also expressed concerns about one answer Albear gave in which he stated that his job was merely to "verify [a] signature" based on the identification provided, not to determine that the person providing the identification was the person whose name appeared on the identification. After positing a hypothetical situation in which counsel appeared before Albear and provided a social security card for identification, counsel asked, "How would you know that I am actually Richard Hirsh?" and Albear responded, "Well, that is not my job. My job is to verify your signature based on what I have in front of me." Closen criticized this answer, noting that Albear's focus on signature rather than identification was inappropriate. However, in Albear's next answer, he clarified his statement, saying, "Well, my job was to receive identification and verify based on the signature and the signature on the identification that it was the person they said they were."

The evidence at trial therefore supports Kinko's claim that it fulfilled its duty to ensure that its training program complied with the requirements of the Act. To the extent that the trial court found that Kinko's breached its duty, we conclude that such a finding is against

the manifest weight of the evidence. Thus, the trial court's finding of liability against Kinko's for negligent training is reversed.

## CONCLUSION

Based on the foregoing, we find that the trial court's determination that Kinko's was liable on the basis of negligent supervision and training is against the manifest weight of the evidence. With respect to the statutory liability claim, we find that plaintiff has forfeited review of the appellate court's judgment. Thus, we affirm in part and reverse in part the judgment of the appellate court, reverse the judgment of the circuit court against Kinko's in its entirety and remand to the circuit court with directions to enter judgment in favor of Kinko's on both counts.

*Appellate court judgment affirmed in part*
*and reversed in part;*
*circuit court judgment reversed;*
*cause remanded with directions.*