2019 IL App (3d) 190236

Opinion filed September 30, 2019

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2019

| | | |
|---|---|---|
| *In re* Tas.C., Ti.C., and Tae.C., | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| Minors | ) | Peoria County, Illinois, |
| | ) | |
| | ) | Appeal Nos. 3-19-0236 |
| (The People of the State of Illinois, | ) | 3-19-0237 |
| | ) | 3-19-0238 |
| Petitioner-Appellee, | ) | Circuit Nos. 16-JA-203 |
| | ) | 16-JA-204 |
| v. | ) | 16-JA-205 |
| | ) | |
| Timothy C., | ) | Honorable |
| | ) | David A. Brown, |
| Respondent-Appellant). | ) | Judge, Presiding. |

JUSTICE HOLDRIDGE delivered the judgment of the court, with opinion.
Justices McDade and Wright concurred in the judgment and opinion.

**OPINION**

¶ 1        In March 2019, the trial court found that Tas.C., Ti.C., and Tae.C.'s best interest favored

terminating the parental rights of the respondent, Timothy C. The respondent appeals.

¶ 2                                          FACTS

¶ 3        At the outset, we note that the respondent only challenges the trial court's best interest

determination. Thus, our background is limited to the facts relevant to that issue.

¶ 4        In August 2016, the Department of Children and Family Services (DCFS) filed a petition

alleging that the children were neglected in that their environment was injurious to their welfare. The petition alleged that the respondent (1) committed acts of violence against the children's biological mother; (2) had a criminal history that included possession of cannabis (2005), resisting police (2006), failure to return from furlough (2006), possession of a controlled substance (2007), four burglary convictions (2010); and (3) had a pending charge for possession of a controlled substance (2016). Shortly thereafter, in December 2016, the respondent was incarcerated and remained incarcerated during the remainder of these proceedings.

¶ 5        In May 2017, the trial court entered an adjudication order, finding that the children were neglected. In July 2017, the court entered a dispositional order, finding the respondent unfit and unable to care for, protect, train, or discipline the children, or unable to do so. Following the State's filing of a petition to terminate the respondent's parental rights, the court found the respondent unfit due to his (1) failure to make reasonable progress toward the return of the children in a nine-month period and (2) depravity.

¶ 6        In March 2019, the trial court held a best interest hearing. The best interest report stated that the children had been in foster care for 927 days. Tas. C. was 11 years old. She was in a foster home and her foster parents were committed to adopting her if she was unable to return to her biological parents. The foster parents met all of her needs and planned to allow her to remain connected to her extended biological family following adoption. Tas.C. was bonded and attached to her foster parents. She was involved in their church, enjoyed being involved in church activities, and played basketball after school. Tas.C.'s foster parents showed continuous love and affection for her and met all of her physical, emotional, developmental, and medical needs. She freely went to her foster parents for support, affection, and reassurance. The caseworker observed Tas.C. to be somewhat happy, healthy, confident, and stable in her foster placement.

2

¶ 7     The report indicated that Ti.C. was ten years old and Tae.C. was nine years old at the time of the best interest hearing. They had been in the same long-term foster home for two years and four months. Ti.C. and Tae.C. had a strong bond with their foster parents and all of their needs were being met. They referred to their foster parents as "mom" and "dad" and their foster parents loved them without condition. Ti.C. and Tae.C. were confident that their foster parents would meet their needs. The caseworker observed Ti.C. and Tae.C. to be happy, healthy, confident, and stable in their foster placement. Their foster parents provided them with stability, a sense of security, a sense of belonging, and continuous love and affection. Ti.C. and Tae.C.'s foster parents met all of their physical, emotional, developmental, and medical needs. Ti.C. and Tae.C. would freely go to their foster parents for support, affection, and reassurance. Ti.C and Tae.C.'s foster parents were willing to continue caring for them until they could be matched with a permanent placement. Ti.C. and Tae.C. had strong community ties, attended church with their foster parents, and were involved with basketball and baseball.

¶ 8     At the hearing, the respondent stated that he last spoke to Tas.C. a month ago. Tas.C. told him that she was going to start playing basketball, would like for her brothers to come watch her, and wanted to be with her siblings. The respondent also stated that Tas.C. expressed that she did not like how "the people" she was at church with scolded her and talked about her in front of others. The respondent stated it had been about six or seven months since he last spoke to Ti.C. and Tae.C. When he last spoke with them, they stated they were playing either softball or baseball, were doing well, and had no complaints. The respondent stated that he felt he had a good bond with his children and that they loved and respected him. The respondent also stated that he felt that the children should stay together.

¶ 9     The respondent stated, prior to going to prison, he would see his children on most

weekends. During the summertime, the children would stay weeks at a time. The respondent would take them to the park, barbeques, to get ice cream, and shopping. All three children continued to call him "dad." The respondent stated he was projected to be released from prison in 2021, but with good time credit, he would be released in September 2020. Upon his release, he planned on getting a job and a house. While in prison, he finished a program for custodial maintenance and was going to start a welding program. The respondent stated, that while he finished his prison term, Charmain Childers and Eleanor Brown could care for the children.

¶ 10      The respondent explained that he had known Childers for about six years and that she was familiar with the children. Childers was the mother of his paramour. The children had been to Childers' house before and they had meals together. When the respondent was asked if Childers expressed a willingness to take care of his children, he stated that she said, if it came down to it, she would. The children last saw Childers in August 2016. He stated that he would be comfortable if his children were placed with Childers. However, he never gave his caseworker Childers' name as a potential placement option—only Brown's.

¶ 11      The respondent stated he gave Brown's address to Howell three to four months ago and gave Nichols the address a couple weeks ago. He did not give any other information other than Brown's name and address. Brown had not seen Ti.C. and Tae.C. since August 2016 and last saw Tas.C. two months ago. We note that it was unclear who Brown was to the respondent. The respondent filed a motion to appoint guardianship to Brown during the proceedings, but did not explain her relationship to himself or his children.

¶ 12      Childers stated that she lived in a four-bedroom house with her son. She retired when her son turned 18 years old, as he had tuberous sclerosis, and she needed to take care of him. She received income from the State of Illinois to take care of her son, which paid her bills. Childers

4

stated she never had any DCFS involvement. When Childers was asked if she would be able to care for three more children, she stated it would "change [her] life, but if that is God's will, then I will." She also stated "[i]t would be something big for [her]," but she would do it if the children needed her. Childers recalled that she volunteered to become the placement for the children a few months ago and the last time she saw Tas.C. was three or four years ago. The children stayed at her house once or twice before and often played with her grandchildren. The children called Childers "grandma" because that was what her grandchildren called her.

¶ 13    The State argued that the children's best interest favored terminating the respondent's parental rights. The State noted that the respondent committed felonies throughout their lives and was currently incarcerated. The State explained that the respondent could only be paroled in 18 months if he received all possible good time credit. Additionally, he never presented Childers to his caseworker, and Childers had not seen the children since August of 2016. The State noted that Childers appeared to be kind-hearted, but reluctant. For example, Childers paused when asked about taking the children. Also, she said (1) she would take them if they needed her, (2) taking them would be "big for her," and (3) she would if it was God's will. The State believed that the respondent presented Childers as a possible placement too late and that he was not thinking about the children's best interest. The State noted that Tas.C. had been in her foster home for 20 months and her foster parents were willing to adopt. Ti.C. and Tae.C. were placed together in a foster home since November 2016, though their foster parents were not willing to adopt, and they were on an adoptive matching service list.

¶ 14    The respondent argued that the petition to terminate parental rights was premature. Essentially, he believed that because Ti.C. and Tae.C. were not in an adoptive home and Tas.C. expressed that she wanted to stay with her siblings, there should have been an option where all

5

three children could have stayed together—which was the option he presented with Childers.

¶ 15    Louise Natonek, the guardian *ad litem*, asked the trial court to terminate the respondent's parental rights and adopted the State's argument. Natonek added that the respondent had been abusive in the past. She also noted that his paramour's mother, who was taking care of her adult son with a severe illness, was not a viable option for the children based on her circumstances.

¶ 16    The trial court stated that it considered all of the evidence and the best interest factors. The court found that the children's physical safety and welfare were being cared for at their foster placements. Additionally, food, shelter, health, and clothing were adequately provided. The respondent was unable to take care of those needs for the children due to his incarceration. The court noted, that while the children were in their placements, they continued to move forward. The children had been forming their own identities moving away from their biological parents. The court believed the children's background and ties were big issues. There were five siblings involved with different fathers and the children were not all placed together. The court also found that the children's cultural and religious ties were being properly addressed and that the children felt a sense of attachment where they felt loved and a sense of value.

¶ 17    The trial court noted that the children were involved in the community with sports activities. The court stated that the children's security and familiarity appeared to be addressed by their foster parents and not their biological parents. The children needed permanency in their lives, which foster care provided them. The court believed the least disruptive placement was with their foster placements and not to return with their biological parents or a family friend. Additionally, there was no evidence that the respondent and the children had a substantial bond that would be better served with his proposed guardian rather than their current foster placements that they had been at for quite some time. The court concluded that it was in the children's best

6

interest to terminate the respondent's parental rights. The respondent appeals.

¶ 18                                    ANALYSIS

¶ 19        On appeal, the respondent argues that the trial court's best interest determination was against the manifest weight of the evidence. The State argues that the court's decision was proper. As the respondent notes, a reviewing court reviews a trial court's best interest determination under the manifest weight of the evidence standard. *In re D.T.*, 212 Ill. 2d 347, 357 (2004). A finding is against the manifest weight of the evidence when an opposite conclusion is clearly apparent or when the finding appears to be unreasonable, arbitrary, or not based on the evidence. *Vancura v. Katris*, 238 Ill. 2d 352, 374 (2010).

¶ 20        Once the trial court makes a finding of unfitness, all further considerations must yield to the child's best interest. *In re D.M*, 298 Ill. App. 3d 574, 581 (1998). In making a best interest determination, the trial court must consider the following factors in the context of the child's age and developmental needs: the child's physical safety and welfare; development of the child's identity; the child's background; the child's attachments; the child's wishes as to his or her custodian and long-term goals; the child's community ties; the child's need for permanence; the uniqueness of every family and child; the risks inherent to substitute care; and the preferences of the people available to care for the child. 705 ILCS 405/1-3(4.05) (West 2018).

¶ 21        The respondent argues that the trial court's best interest determination was against the manifest weight of the evidence because (1) the children were not placed together when Childers was willing to care for all three children, (2) Tas.C. expressed her desire to be placed with her siblings, and (3) only Tas.C.'s foster parents were willing to adopt.

¶ 22        First, the evidence presented at the best interest hearing demonstrated that Childers was reluctant to care for the children and questioned her ability to do so. Childers stated that taking

7

care of the children would be "something big" for her, it would change her life, and she would do it if the children needed her and if it was God's will. Childers spoke about how she retired to take care of her adult son who suffered from tuberous sclerosis and her only income was from taking care of her son. Childers stated that she had not seen Tas.C. for three or four years and the children had only stayed at her house once or twice before. Additionally, the respondent failed to provide his caseworkers with Childers information to determine if she was a suitable placement as Childers was only introduced as a placement option at the best interest hearing. We also note that the trial court in this case specifically considered that the children's background and ties were big issues in this case as there were five siblings involved with different fathers and the children were not all placed together. However, the other best interest factors in this case demonstrated it was in the children's best interest to remain in their placements.

¶ 23    Second, although Tas.C. expressed a desire to be placed with her siblings, this desire is outweighed by other considerations we have discussed in this case. Also, the best interest report indicated that Tas.C.'s foster parents planned to allow her to remain connected to her biological family following adoption. Tas.C. was bonded and attached to her foster parents, involved in their church, enjoyed being involved in church activities, and attended basketball after school. Tas.C.'s foster parents showed continuous love and affection for her and met all of her physical, emotional, developmental, and medical needs. The caseworker observed Tas.C. to be somewhat happy, healthy, confident, and stable in her foster placement. Additionally, although Tas.C. was not placed with her siblings, the agency was seeking a permanent placement for Ti.C. and Tae.C. to remain together as a pair. Based on these circumstances, the court did not err.

¶ 24    Last, the current availability of an adoptive home is only one of the considerations when determining the best interests of a child. See *In re Shru. R.*, 2014 IL App (4th) 140275, ¶ 26

("lack of an adoptive home is only one factor to take into consideration, and 'the better alternative' may be to give the child permanency they need and deserve through continued involvement with the foster family, even if no adoption is available"). The record demonstrated that Ti.C. and Tae.C. bonded with their foster parents and all of their needs were being met. At the time of the best interest hearing, they had been in that placement for two years and four months. Ti.C. and Tae.C. referred to their foster parents as "mom" and "dad." The caseworker observed Ti.C. and Tae.C. to be happy, healthy, confident, and stable in their current foster placement. Their foster parents provided them with stability, a sense of security, a sense of belonging, and continuous love and affection. Their foster parents were willing to continue caring for them until the agency could match them with a permanent placement. Ti.C. and Tae.C. had strong community ties, attended church with their foster parents, and were involved with basketball and baseball. It is evident from the record that Ti.C. and Tae.C's placement with their foster parents provided them with the permanency they needed and deserved until a more permanent placement could be located.

¶ 25    Considering the record in this case and the best interest factors, we agree with the trial court that the children's best interest favored terminating the respondent's parental rights.

¶ 26    CONCLUSION

¶ 27    The judgment of the circuit court of Peoria County is affirmed.

¶ 28    Affirmed.