# ILLINOIS OFFICIAL REPORTS

## Appellate Court

### *J.M. v. Briseno*, 2011 IL App (1st) 091073

| | |
|---|---|
| Appellate Court Caption | J.M., Petitioner-Appellant, v. MARK BRISENO, Respondent-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1–09–1073 |
| Filed | June 3, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's denial of a petition for an order of protection under the Civil No Contact Order Act after petitioner was allegedly sexually assaulted by respondent was reversed where petitioner met her burden of showing by a preponderance of the evidence that she was the victim of nonconsensual sexual penetration under the Act, notwithstanding the argument of respondent's attorney that there was not enough "to show that there was a lack of consent," since the Act provides that, if the court finds that petitioner has been a victim of nonconsensual sexual conduct or nonconsensual sexual penetration, a civil no-contact order shall issue, the standard of proof is proof by a preponderance of the evidence, petitioner met that standard in proving that she was the victim of nonconsensual sexual penetration while she was intoxicated, a note left by respondent after the incident and the text messages he sent reflected his guilty conscience, there was no unreasonable delay in petitioner's outcry, a detective who investigated the incident found petitioner was "credible" and that the rape kit came back positive for semen, there was no evidence suggesting petitioner expressly or implicitly consented, the trial court provided no explanation to justify its finding that "it is more likely than not that [petitioner] consented," the Act did not require her to provide medical evidence of sexual penetration or physical injury, respondent presented no motive for petitioner to falsely accuse him of the assault, and the minor contradictions in petitioner's testimony were inconsequential as to the issue of whether the nonconsensual penetration occurred; therefore, the cause was remanded for the issuance of a plenary civil no-contact order against respondent. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08–OP–1642; the Hon. Maureen Ward Kirby, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Neha Lall and Denice Wolf Markham, both of Life Span Center for Legal Services, and Richard C. Godfrey, P.C., Catherine Fitzpatrick, and Uma M. Amuluru, all of Kirkland & Ellis LLP, both of Chicago, for appellant.<br><br>Karnig S. Kerkonian, of Kerkonian Law Firm PC, of Evanston, for appellee.<br><br>Allegra R. Rich and Molly M. Joyce, both of Seyfarth Shaw LLP, of Chicago, for *amici curiae*. |
| Panel | JUSTICE CAHILL delivered the judgment of the court, with opinion.<br>Justices McBride and R.E. Gordon concurred in the judgment and opinion. |

## OPINION

¶ 1 Petitioner-appellant J.M. appeals the trial court's denial of her petition for an order of protection under the Civil No Contact Order Act (Act) (740 ILCS 22/101 *et seq.* (West 2008)) after she was allegedly sexually assaulted by respondent. She contends that: (1) the trial court erred by disproportionally allocating the burden of proof to petitioner, and (2) the court erred in interpreting the Act to require corroborating evidence of sexual penetration, petitioner to testify to her own opinion that she was unable to consent to sexual penetration, and the court to presume petitioner's consent. We reverse.

¶ 2 Petitioner filed for and was granted an emergency petition for a no-contact order under section 214 of the Act (740 ILCS 22/214 (West 2008)) on March 28, 2008. Petitioner then sought a plenary no-contact order under section 215 of the Act (740 ILCS 22/215 (West 2008)).

¶ 3 At the hearing on the plenary order Julian Portillo testified that he was a student at University of Chicago Law School and a friend of petitioner. At 4 p.m. on Friday, February 15, 2008, Portillo and petitioner went to a social event hosted at the law school called "Wine Mess." Portillo had challenged petitioner to a drinking contest. Portillo, petitioner,

respondent Mark Briseno, Ben Burry, Derrick Doller and David Cheng drank and played foosball until the Wine Mess finished at 6 p.m. Portillo estimated that he and petitioner each drank about eight bottles of beer during the event. The group left and went to the graduate student pub around 6:20 p.m. Respondent walked with the group to the pub but left and went to the "graduate students' speed drinking." Portillo, petitioner, Burry, Doller and Cheng stayed at the pub and continued drinking until about 10 p.m. Portillo estimated he consumed about 18 drinks throughout the night. When Burry, Cheng, petitioner and Portillo left the pub, petitioner "seemed very drunk" and was acting "erratically." Portillo told Burry he did not think petitioner should be drinking anymore. Petitioner, Cheng and Portillo left the pub and began to walk toward the law school. Burry did not go with the group toward the law school.

¶ 4        On the walk back petitioner fell on the ground twice and cut her hands. Portillo, Cheng and petitioner stopped at the law school to get coffee. Petitioner went into the women's bathroom and was screaming "that she wanted to go home." Portillo and Cheng said they would take her home, but then petitioner said she did not want to leave. Petitioner was crying and screaming and "looked very frazzled compared to the way she normally looked." Portillo answered a phone call and, when he finished, saw petitioner leaving with respondent. When Portillo left the law school he saw petitioner get into respondent's car.

¶ 5        Portillo testified that he spoke to respondent on the phone the next day and told him not to call petitioner anymore because "he had been calling and bothering her."

¶ 6        David Cheng testified consistently with Portillo. He explained that the drinking game he played with petitioner and Portillo involved drinking three beers in the first hour and two beers each subsequent hour. Cheng told petitioner he would try to "stop her at 10 beers" to make sure she got home safe. He had at least seven 12-ounce beers. He said that Portillo and petitioner "always had the same amount of beers."

¶ 7        After the Wine Mess Cheng said petitioner was "fairly inebriated." A group of people went to the graduate student pub. Cheng had about 9 or 10 more drinks at the pub but stopped because he did not "want to lose complete control." Petitioner and Portillo continued to drink beyond that amount. He thought petitioner had about 12 drinks. Cheng said his memory of the events that happened at the pub was intact and he "could definitely remember everything."

¶ 8        Around 10 p.m. Cheng and Portillo decided to walk petitioner home. Petitioner was acting angry because she did not want to be taken home and "was cursing a lot and just completely like a different person." On the walk home they decided to stop at the law school so petitioner could use the bathroom. Petitioner fell down at least once in the street and there was blood on her palms. At the law school petitioner went into the bathroom and refused to leave. Cheng felt frustrated with petitioner's behavior. She was crying and "just saying stuff that really didn't make sense at all; and she was still drunk." Respondent came in and asked where petitioner was and then went into the bathroom to get her. Petitioner left voluntarily with respondent.

¶ 9        Cheng spoke with petitioner on an online instant messenger system ("G-chat") the next day at 4 p.m. He was frustrated with how she acted the night before, so he initially

ignored her. She then called about eight times within an hour, and he finally picked up. Petitioner sounded very distraught and was excessively crying. She said she "couldn't remember anything" and asked Cheng what happened. At the end of the conversation, petitioner said "I think I got raped. No, I know I got raped." Cheng told petitioner she needed to go to the hospital to get tested for sexually transmitted diseases and possibly report the case.

¶ 10    Cheng testified that later that evening, he and their mutual friend Alexandra Levy picked up petitioner and went to the hospital. Petitioner looked confused and distraught. They went to the University of Chicago Hospital and were there "all night."

¶ 11    Levy testified that she called petitioner at 6 p.m. on Saturday, February 16, 2008. Something sounded "off" about petitioner's voice and petitioner told her she was going to the "Rape Crisis Center." Levy called the "Dean on Call" at the University of Chicago and the dean called petitioner and told her to go to the hospital. Levy picked up Cheng, then picked up petitioner and took her to the hospital where the dean met them. The dean then "took over" and petitioner was examined by doctors while Levy was questioned by the police. After petitioner's exam, Levy went in to see how she was doing and saw bruises on her legs. On petitioner's right calf there was a bruise that looked like a handprint.

¶ 12    Petitioner testified that she met respondent in a law school class and they were seated next to each other in two classes. They did not socialize outside of class.

¶ 13    Portillo invited her to go "beer-for-beer" at the February 15, 2008, Wine Mess. Cheng was also invited too, and petitioner trusted him and Portillo. Petitioner said she weighed about 100 pounds during the time in question and had not eaten that day. She met Portillo and Cheng at the Wine Mess around 4:15 p.m. and they started drinking beer and playing foosball. Respondent was "lurking around the table area" but petitioner did not speak to him. Petitioner said she drank continuously from the time she arrived at the Wine Mess until 7 p.m and had about seven beers.

¶ 14    Petitioner left the Wine Mess with Portillo and Cheng and went to the graduate student pub, where they continued the drinking game. She still had not eaten and continued to drink from the time she entered the pub until she left two or three hours later. She estimated that she drank five or six beers at the pub.

¶ 15    After leaving the pub things started to get "fuzzy." She remembered walking toward the law school and being drunk and upset with Portillo and Cheng but could not remember why. She could not remember falling in the street. She remembered being inside the law school bathroom, crying and wanting to be alone. She remembered respondent calling her on her cell phone and felt surprised because she did not have his number and did not think he had hers. She answered the call and had a brief conversation with respondent but could not remember what they talked about. The next thing she remembered is respondent coming into the bathroom, taking her by the arm and leading her out.

¶ 16    Petitioner found herself at her apartment, which is two blocks from the law school. She could not remember how she got there. Inside her apartment respondent lit a cigarette for her and showed her a tattoo on his arm. Petitioner told respondent she was tired.

¶ 17    Petitioner then found herself sitting in a chair in a "strange place." She knew she was

not in her apartment anymore because the furniture was not hers. She remembers pornography playing on a TV on the wall. Respondent gave her two beers.

¶ 18      She next remembers being in her bed at her apartment and respondent vaginally penetrating her. She felt a "loss of control," felt "petrified" and was confused. She told him "that this was not something I wanted to do and that, you know. I was Catholic. I did go to church. I just didn't want to be doing this." She had an "overwhelming realization" respondent was not using a condom. She tried to push respondent off her but his body felt very heavy and she was "so drunk at that point, I don't think that I could really move much." Respondent did not react to what she said, and petitioner "passed out."

¶ 19      Petitioner woke up the next morning naked, confused and scared. She noticed that the bed sheets were soaked in urine and that respondent was lying next to her in bed. She told respondent that he "shouldn't be there" and he left. Petitioner lay on the bed for a very long time, curled into a ball and shaking. After a couple of hours she went into the shower with her clothes on and sat in the bathtub with the water running. She got out of the bathtub and changed. She noticed a hand-written note on her desk. The note reads:

> "Hey, I am sorry about last night. I wasn't sure what you thought but I guess I just figured it out this morning. Just so you know, I wasn't trying to make a move or anything like that. I do really like you. I hope things are not weird between us. I don't know what to say, except sorry for making things weird. I probably just took the messages I wanted to receive from you. I hope we can at least still be friends. *** I do like you. I guess that's out and won't make things much weirder. Just so you know. Not in a creepy way but a respectful way and really am sorry if things went past where you were comfortable. [Respondent.]"

¶ 20      Petitioner did not call the police because she was in a "state of shock" and did not want "strange people" in her apartment when she was already "just so terrified." She knew she "needed to tell someone [she] was close with." She tried to contact Cheng at 3 p.m. on G-chat and on the phone, but he ignored her. She tried to find a condom wrapper because she remembered "thinking that [respondent] had put on a condom" and was hoping to find one but could not. She did not see either of the beer bottles from the night before. She kept two condoms in a drawer next to her bed, and both were still there. She looked at the call log on her cell phone and saw she had received a call from respondent at around 11 p.m. the previous day. She noticed that all the text messages in her phone had been deleted and did not know how that had happened.

¶ 21      Eventually Cheng called petitioner back and she told him what happened. Later on Levy called petitioner and petitioner told Levy she needed to find a rape crisis center. Levy agreed to help. Petitioner also spoke to Bonnie Kanter, the sexual abuse counselor on call at the University of Chicago. Kanter told her to go to the University of Chicago Hospital. Levy said she would pick up petitioner and take her there.

¶ 22      Petitioner then got a text message from Ben Burry, saying he was on his way to pick her up to go to dinner. She had forgotten that they had made plans to go to dinner the night before and told Burry it was ok to pick her up. While they were at dinner she did not tell Burry what had happened with respondent the night before because she did not want "more

people being upset." When she tried eating, she felt sick and went into the bathroom to throw up, so Burry took her back to her apartment.

¶ 23 Levy picked petitioner up and took her to the hospital that night. The police came and interviewed Levy, petitioner and Cheng. Petitioner underwent extensive and invasive medical examinations. She was given medication to prevent pregnancy, sexually transmitted diseases and HIV. The medications made her nauseous and she lost about 10 pounds in the weeks after. One of the nurses said that a bruise on her calf looked like a "grab mark." The police officers took pictures of the bruises on petitioner's legs. She told the police she wanted to file criminal charges against respondent.

¶ 24 Around 4 a.m. on Sunday, February 17, 2008, respondent repeatedly called and texted petitioner. The text messages said: "I feel terrible about what happened the other night; I don't want you to hate me" and "I'm sorry for what happened." She texted respondent "please don't contact me again." Petitioner ignored respondent's phone calls.

¶ 25 Petitioner told Kanter she did not want to go to class if she had to sit next to respondent, and respondent's seat was moved in the class. She was afraid to see respondent in the law school and would call Levy to make sure respondent was not around.

¶ 26 On cross-examination petitioner said she did not remember who she spoke to at the Wine Mess or graduate pub, falling down in the street, why she was upset when she was in the law school bathroom, where the "strange place" was she was brought to and whether or not she told the police she went out to eat with Burry. Petitioner admitted that she did not mention going to eat with Burry at her deposition and that she had told respondent's attorney she did not leave her apartment on Saturday, February 16, 2008, until Levy picked her up to go to the hospital. She said that some of the bruises on her legs had been there before the night in question.

¶ 27 Detective George Gallagher testified that he interviewed petitioner, Levy and Cheng at the hospital in the early morning of February 17, 2008. Gallagher found petitioner to be "credible" during his interview with her. He went to petitioner's apartment and an evidence technician took bed sheets and the note respondent had left. A copy of the note was entered into evidence. A rape kit administered at the hospital was processed by the Illinois State Police and the vaginal swabs came back positive for the presence of semen.

¶ 28 On cross-examination Gallagher said petitioner did not tell him she went to get a meal with Burry on February 16, 2008.

¶ 29 Officer Prazmowski testified that petitioner identified respondent as the person who sexually assaulted her and she had told respondent "I don't want to do this. I go to church now."

¶ 30 Benjamin Burry testified he went to the Wine Mess by himself and met up with several other law students. He saw petitioner with Portillo and Cheng and said they were having a drinking competition. He also saw respondent but did not talk to him. Around 6:30 p.m. Burry left with petitioner, Portillo and Cheng and decided to go to a pub on campus. While they were standing outside the Wine Mess, petitioner, Portillo, Cheng and Burry exchanged phone numbers with respondent, who was going to another event. They all agreed to meet up later.

-6-

¶ 31        Burry drove petitioner, Portillo and Cheng to the pub. At the pub he saw petitioner drinking continuously from the time she arrived until she left. He estimated she had about seven or eight beers at the Wine Mess and about three or four more at the pub. Petitioner, Portillo, Cheng and Burry left the pub around 9:30 p.m. Petitioner looked very intoxicated. Burry did not go with them to the law school because he had another engagement. He invited them to come with him but Portillo and Cheng said they needed to take petitioner home because they had promised her to do so.

¶ 32        When Burry woke up the next morning, he saw that petitioner had sent him a text message in the early morning between 2 and 4 a.m. The text message communicated that she was "at the bar," did not know where she was and "there was some sort of shady, unscrupulous guy at the bar."

¶ 33        Burry said that he had not made plans to go to dinner with petitioner that night and that it was an "impromptu invitation." When they were at dinner petitioner looked like she had something on her mind and was introverted. She did not seem interested in talking, did not eat any of her food and spent most of the time in the bathroom.

¶ 34        The parties rested and gave closing arguments. Petitioner's attorney said that all that needed to be proven for the civil no-contact order to issue is "that petitioner has been a victim of a single act of nonconsensual sexual conduct or nonconsensual sexual penetration" and that "the penetration happened without her freely given consent, her freely given agreement." Counsel said that the court could find two bases for issuing the order: (1) petitioner's "account has not been rebutted by any alternative description or explanation of what happened" and/or (2) "that petitioner was rendered incapable of giving freely given agreement to sexual intercourse because of her highly intoxicated state."

¶ 35        Respondent's attorney argued that there was not "enough here to show that there was a lack of consent."

¶ 36        The court denied petitioner's request for a plenary no-contact order. The court framed the issue in the case as "whether non-consensual sexual penetration occurred in the early morning hours of February 16th, 2008" and that "the ultimate question comes down to whether there was consensual sex or not. That's the ultimate issue. It really all comes down to [p]etitioner's credibility." The court said it had "too many concerns" about petitioner's memory and did not know whether petitioner had "an accurate independent recollection of the events that happened on February 15th and February 16th of 2008." The court noted that it looked at the pictures of the bruises on petitioner's legs but said: "I don't see a handprint and I don't know how those bruises got there and I didn't have any medical testimony. And I know that there's medical records, and I didn't have any of it." The court criticized Officer Gallagher's testimony on the rape kit because he did not testify to whose semen was recovered, there was no chain of custody, it was hearsay and he was not qualified as an expert. The court found the note left by respondent "very equivocal" and did not "take it as an admission of rape." The court observed that "petitioner didn't call the police" or "leave a voice mail message for her friends." The court said "I know you didn't want this to happen" but found that it was "more likely than not that [petitioner] consented." The court denied the petition for a plenary order and terminated the emergency civil no-contact order.

-7-

¶ 37        On appeal, petitioner contends that the circuit court erred by ignoring the statute's standard of proof and erroneously construing the Act. Specifically, petitioner argues that the court's interpretation of the Act was erroneous because: (1) the statute does not require corroborating evidence of penetration; (2) the statute does not require the victim to testify that she was too drunk to consent to establish legal incapacity; and (3) the statute does not allow the court to presume consent.

¶ 38        We first note that the parties disagree on the standard of review. Petitioner contends we should review the trial court's ruling *de novo* because this case involves the interpretation of the Act. See *Wade v. City of North Chicago Police Pension Board*, 226 Ill. 2d 485, 877 N.E.2d 1101 (2007). Respondent contends that the trial court's ruling should be reviewed under a manifest weight of the evidence standard because the facts are in dispute. See *In re Estate of Savio*, 388 Ill. App. 3d 242, 246-47, 902 N.E.2d 1113 (2009).

¶ 39        Here the trial court correctly identified that "[t]he issue is whether non-consensual sexual penetration occurred in the early morning hours of February 16th, 2008." The trial court found the evidence showed petitioner consented to the sexual penetration. Contrary to petitioner's argument, the issue before this court does not involve statutory interpretation. Rather, the issue is whether the trial court correctly found the facts show by a preponderance of the evidence that petitioner was not entitled to a plenary civil no-contact order. Because this case involves the application of the Act to disputed facts, we agree with respondent that we should review the trial court's finding under a manifest weight of the evidence standard. See *In re Estate of Savio*, 388 Ill. App. 3d at 246-47. "A finding is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Vancura v. Katris*, 238 Ill. 2d 352, 385-86, 939 N.E.2d 328 (2010) (citing *Eychaner v. Gross*, 202 Ill. 2d 228, 252, 779 N.E.2d 1115 (2002)).

¶ 40        The purpose of the Act is to provide a civil remedy to protect victims of sexual assault from future interactions with the offender. 740 ILCS 22/102 (West 2008). A petition under the Act may be filed "by any person who is a victim of non-consensual sexual conduct or non-consensual sexual penetration, including a single incident of non-consensual sexual conduct or non-consensual sexual penetration." 740 ILCS 22/201(1) (West 2008). " 'Sexual penetration' means any contact, however slight, between the sex organ or anus of one person by an object, the sex organ, mouth or anus of another person." 740 ILCS 22/103 (West 2008). Evidence of the "emission of semen is not required to prove sexual penetration" and the court "may not require physical injury on the person of the victim" in determining whether to issue a civil no-contact order. 740 ILCS 22/103, 213(a) (West 2008). The Act provides that, if "the court finds that the petitioner has been a victim of non-consensual sexual conduct or non-consensual sexual penetration, a civil no[-]contact order shall issue." 740 ILCS 22/213 (West 2008).

¶ 41        The standard of proof in a proceeding under the Act "is proof by a preponderance of the evidence." 740 ILCS 22/204 (West 2008). A "preponderance of the evidence" means that the evidence presented renders a fact more likely than not. *People v. Brown*, 229 Ill. 2d 374, 385, 892 N.E.2d 1034 (2008).

¶ 42    Here we find petitioner proved by a preponderance of the evidence that she was the victim of nonconsensual sexual penetration under the Act. On Friday, February 15, 2008, while petitioner was extremely intoxicated in the law school bathroom, respondent arrived, went into the bathroom and left with petitioner. The call log on petitioner's phone showed that petitioner answered a call from respondent around 11 p.m. Petitioner remembers respondent taking her by the arm and leading her out.

¶ 43    Petitioner was taken to a "strange place" and remembers respondent giving her two beers. Her next memory is being in her bed at her apartment with respondent vaginally penetrating her. Petitioner said she felt "petrified" and told respondent "that this was not something I wanted to do." She testified that she tried to push respondent off of her but was so intoxicated she could not "really move much." When petitioner awoke the next morning to find respondent lying next to her, she immediately told him he "shouldn't be there" and he left. This aspect of petitioner's testimony was unimpeached and unrebutted. See *Bazydlo v. Volant*, 164 Ill. 2d 207, 215, 647 N.E.2d 273 (1995) ("the fact finder may not arbitrarily or capriciously reject unimpeached testimony").

¶ 44    We believe that if petitioner "didn't want [the sexual assault] to happen," told respondent the same and tried to push him off of her, she did not consent to the sexual penetration. See 740 ILCS 22/103 (West 2008) (" '[n]on-consensual' means a lack of freely given agreement"); *People v. Bowen*, 241 Ill. App. 3d 608, 617-18, 609 N.E.2d 346 (1993) (where the facts "present circumstances affording a person of ordinary intelligence a reasonable opportunity to know the victim did not consent to have sexual relations" there is no consent).

¶ 45    The note left by respondent and the text messages he sent her after the incident further corroborate petitioner's testimony and reflect respondent's guilty conscience. In the note, respondent wrote: "Hey, I am sorry about last night," "sorry for making things weird" and "really am sorry if things went past where you were comfortable." In the early morning of Sunday, February 17, 2008, respondent texted petitioner: "I feel terrible about what happened the other night; I don't want you to hate me" and "I'm sorry for what happened." While the trial judge found the note "very equivocal," when viewed with the facts in their entirety, we believe the note and text messages are probative that the sexual penetration was not consensual. We also note that respondent did not testify at trial, and we may assume his testimony would have been unfavorable to his case. See *Nasrallah v. Davilla*, 326 Ill. App. 3d 1036, 1044, 762 N.E.2d 25 (2001) (the trier of fact may draw negative inferences against a party that refuses to testify).

¶ 46    There was no unreasonable delay in petitioner's outcry. Petitioner testified that she did not call the police on the morning in question because she was in a "state of shock" and did not want "strange people" in her apartment when she was already "just so terrified." See *People v. Bowen*, 241 Ill. App. 3d at 620 ("[a] delay in reporting incidents of sexual assault may be reasonable where the victim's silence is attributed to fear, shame, guilt and embarrassment"). Petitioner knew she "needed to tell someone [she] was close with" and later called Cheng to tell him "I know I got raped."

¶ 47    The events of that night further support petitioner. At the hospital petitioner

underwent an extensive and invasive medical examination. She took medications to prevent pregnancy, sexually transmitted diseases and HIV that made her so nauseous she lost 10 pounds in the weeks after. Detective Gallagher testified he found petitioner to be "credible" and that a rape kit administered at the hospital came back positive for the presence of semen.

¶ 48    While a fair amount of evidence was presented showing petitioner's lack of consent, we find no evidence to suggest petitioner expressly or implicitly consented. See *Bazydlo*, 164 Ill. 2d at 215. The trial court provided no explanation to justify its finding that "it is more likely than not that [petitioner] consented." There was no requirement for petitioner to provide medical evidence of sexual penetration or physical injury. 740 ILCS 22/103, 213(a) (West 2008) (the court "may not require physical injury on the person of the victim" in determining whether to issue a civil no-contact order). Respondent presented no evidence of a prexisting relationship between petitioner and respondent. See 725 ILCS 5/115–7(a) (West 2008) (in criminal prosecutions for sexual assault, evidence concerning the past sexual conduct of the victim may be admissible when offered by the accused to show the victim consented to the sexual conduct). Respondent also presented no motive for petitioner to falsely accuse him of the assault.

¶ 49    Respondent points to relatively minor contradictions in petitioner's testimony to justify the trial court's ruling that petitioner was not credible, such as petitioner's deposition statement that she stayed in her apartment the entire day on February 16, 2008, before going to the hospital. But, given the weight of the evidence presented, we find such minor contradictions inconsequential as to the central issue of whether nonconsensual sexual penetration occurred. See *Bowen*, 241 Ill. App. 3d at 620 ("minor inconsistencies in the testimony do not, of themselves, create a reasonable doubt as to defendant's conviction").

¶ 50    Having found the evidence sufficient to prove petitioner was the victim of nonconsensual sexual penetration, we need not address petitioner's contention that she was legally unable to give consent due to intoxication.

¶ 51    We find that petitioner met her burden to show by a preponderance of the evidence that she was the victim of nonconsensual sexual penetration under the Act. She is entitled to an order of protection under the Act, and the trial court's findings to the contrary were against the manifest weight of the evidence. We remand this cause to the trial court for the issuance of a plenary civil no-contact order against respondent under sections 213 and 215 of the Act. 740 ILCS 22/213, 215 (West 2008).

¶ 52    Reversed and remanded.