2023 IL App (1st) 221236-U

No. 1-22-1236

Order filed November 17, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| ALLYSSA M. BUJDOSO, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 OP 78015 |
| | ) | |
| MARK R. LENINGTON, | ) | Honorable |
| | ) | Geri Pinzur Rosenberg, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court.
Justices C.A. Walker and Tailor concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Trial court's order granting plenary order of protection is affirmed because the evidence showed that the parties were in a dating relationship as required by the Domestic Violence Act of 1986.

¶ 2    What constitutes a dating relationship under the Domestic Violence Act of 1986 in the age of social media and messaging? Today, a dating relationship can take several forms besides a traditional dinner or outing, including online interactions. This appeal involves both.

¶ 3    Respondent Mark Lenington, representing himself, appeals the emergency and plenary orders of protection issued against him, contending he and petitioner Allyssa Bujdoso were not in a dating relationship as required by the Act (750 ILCS 60/101 *et seq.* (West 2020)). We disagree. The manifest weight of the evidence supports the trial court's finding that the parties had a dating relationship, going on three dates and communicating via the Internet for nearly three months in a romantic relationship.

¶ 4                                    Background

¶ 5    Bujdoso filed her *pro se* petition for an independent order of protection in November 2020, alleging that she and Lenington had "a dating" relationship. On November 6, Bujdoso appeared before the court and swore that the allegations in her petition were true. On the court's examination, she testified that she had a date with Lenington and they "spent time" together in 2016, though she denied he was her boyfriend. She described a video posted by Lenington on October 19, 2020: he "ran through a list of people that he feels have wronged him over the years and [brought] up when [Bujdoso] was raped," saying "I probably reminded you of the guy that raped you." In another video, of November 1, 2020, Lenington simulated killing Bujdoso and two other women, "us[ing] names that rhyme" with their actual names and "referenc[ing] specific events that have happened between each of the different women and him," including "the time [Bujdoso] had to ask him to leave the bar [she] worked at and he wouldn't leave."

¶ 6    Bujdoso recounted that the day after that summer 2016 incident at the bar, Lenington grabbed her arm in a coffee shop and "wanted to know why I didn't want to date him, why I didn't want to see him or talk to him anymore." Bujdoso felt threatened by Lenington's videos and feared

he would continue harassing her. The court issued an emergency order of protection against Lenington and periodically extended it.

¶ 7    Bujdoso filed an amended petition and a second amended petition in February 2021. In the second amended petition, Bujdoso reiterated that the parties had a date in May 2016. Shortly after, Lenington appeared at a bar where Bujdoso worked and tried repeatedly to speak with her, which she refused. He stayed until the bar closed and "asked if we were going out together." Bujdoso told Lenington she had plans with someone else and "escorted [him] out of the bar." Following this, he sent her "numerous" messages.

¶ 8    The day after the incident at the bar, Bujdoso and Lenington met by chance at a coffee shop. Lenington continued trying to speak with Bujdoso, at one point grabbing her arm. She told him to stop and let her go. She sent him a message on May 23, 2016, telling him, "Do not contact me." Bujdoso alleged that Lenington suffered from mental illness, as he acknowledged online in a February 2020 post stating he "has been taking medication on and off" and had "mild thoughts of suicide at times, but I don't think I'd ever act on them."

¶ 9    Bujdoso alleged that Lenington and Adam Kwaselow, a mutual acquaintance, texted on October 5, 2020, during which Lenington stated, "That was a nefarious bogus sexual assault claim," and admitted messaging Bujdoso "after [she] told [him] to stop" because "she embarrassed me and then started hating on me."

¶ 10    Bujdoso alleged that Lenington posted a video to YouTube on October 19, 2020, "in which he made a direct reference to [Bujdoso] at the end." While Bujdoso was not named in the video, Lenington referred to the 2016 incident and a radio show "in which [Bujdoso] discussed having previously been assaulted."

¶ 11    Lenington posted on Facebook on October 29, 2020, "a picture *** of him spray-painting a gun with the caption 'Spray painting a toy gun outside [in] Downtown Chicago. Not the chillest thing I've ever done ... by far. I wonder [what] this is for??' "

¶ 12    On November 1, 2020, Lenington posted a video "to his Facebook. Twitter, Instagram and YouTube pages" portraying Bujdoso as "Clarissa." Gina Palm and Liz Stockwell, whom Bujdoso and Lenington knew through their involvement in the Chicago comedy "scene," also were represented by "characters having names which rhyme with their actual names," Tina Calm and J.C. (name exceedingly vulgar), respectively. Bujdoso alleged that Lenington removed the video after the emergency order but subsequently reposted it, and she believed it was still available online.

¶ 13    According to the petition, the video depicts Lenington bringing Clarissa onto a comedy stage, where Clarissa spread rumors about Lenington, who spoke with Tina before shooting himself in the head. Clarissa, Tina, and J.C. then appeared in a graveyard, discussing systemic racism and carrying "rape whistles" (both allegedly referring to Bujdoso). Lenington drew a gun, shot the three characters in their heads, and dismembered their bodies with an axe, repeating, "I am not a rapist," "I am not a mass shooter," and "You are not a victim." Then, he poured a glass of wine and laughed while drinking it.

¶ 14    Bujdoso alleged that Lenington communicated "directly on or about January 21, 2021[,] and February 13, 2021," despite the emergency order of protection. She attached emails from Lenington to her counsel stating that he had mailed copies of documents directly to Bujdoso.

¶ 15    In January 2021, Lenington filed a motion to vacate the emergency order of protection, dismiss the petition, and refer the matter for prosecution. The motion has no content beyond

incorporating an "addendum" by reference, which does not appear in the record. Later that month, the court denied Lenington's motion.

¶ 16    In April and June 2021, Lenington filed answers to the second amended petition, denying the allegations. He asserted that "[t]he parties briefly interacted as *casual acquaintances*," physically meeting only three times, and while they "discussed the possibility of going out to dinner, this was a casual discussion that did not result in a meeting or any exchange of intimacy." (Emphasis in original.) Lenington asserted that Bujdoso may have seen his online postings, "but I never asked anyone to contact her," and stated his belief "that she was [not] truly in fear" but claimed to be so that an order of protection would "legitimize her past disparaging comments *** and continue to destroy my reputation." Lenington claimed that he sent Bujdoso copies of documents after asking court personnel if doing so would violate the order of protection and being assured it would not.

¶ 17    At the hearing on a plenary order of protection, Kwaselow testified that he knew the parties from "the Chicago comedy scene" for four to six years. Bujdoso's reputation in that community was "she is not considered untrustworthy or disreputable to any notable degree." Kwaselow identified messages from Lenington in October 2020, in which Lenington "express[ed] some grievances" online, including that "women had said that there was [*sic*] stories of [Lenington] making them feel uncomfortable." Lenington attempted to clear his name, but Kwaselow suggested that he consider his past actions to "see if anything was taken the wrong way. And [Lenington] did not appreciate that suggestion."

¶ 18    As they discussed people who might refer to Lenington as "being untrustworthy or dangerous to women," Lenington mentioned Bujdoso as "somebody who had spread lies about

him." He admitted "catfish[ing]" Bujdoso, or communicating with her using a false persona, "because she embarrassed me and then started hating on me." Kwaselow reiterated that Lenington first mentioned Bujdoso and explained that Lenington used a false persona online multiple times "to deceive people." On cross-examination, Kwaselow testified that he did not recall a "feud" in 2016 between Bujdoso and Lenington.

¶ 19 Lenington, called as Bujdoso's witness, declined to state his home address. The court found no "safety issue" in disclosing the address and noted that the court would need his address if it issued a plenary order, but Bujdoso's counsel withdrew the question.

¶ 20 Lenington testified he met Bujdoso in 2016, once each in March, April, and May, and they were in contact from March to May of 2016. In March 2016, Lenington was "emcee" of a comedy "open mic" show with about 50 participants, including Bujdoso, whom he introduced and spoke with after the show. While they had mutual acquaintances in comedy, he had not met or heard of her until then. She mentioned that she worked at a bar with an "open mic" show, and Lenington saw her again in April and May 2016 when he went to the bar.

¶ 21 Between their March and April meetings, the parties communicated online "once or twice" as Lenington was interested in performing in the "open mic" at her bar. During communications, he suggested meeting for dinner "sometime," Bujdoso agreed, but they mainly discussed comedy. Lenington denied (i) any "affection or an expectation" explaining that he also dined with friends and acquaintances and (ii) his purpose in asking Bujdoso to dinner was romantic, asserting that he does not assess whether someone will be an acquaintance, friend, or girlfriend until after meeting. Lenington did not know or care whether she was in a romantic relationship and denied asking if

she was single. During the conversation, "we had both expressed that we were not looking for anything serious, which would have meant romantic intertwine intimacy."

¶ 22    When Lenington went to Bujdoso's bar in April 2016, his "driving purpose" was not to see her. He would go to a venue before he performed "to see if I'd be comfortable doing comedy in front of people in that space." He stayed "a couple of hours," which he admitted was longer than necessary to "scope out" a comedy venue. As he sat drinking and using his phone, he spoke with Bujdoso infrequently as she was working.

¶ 23    Lenington testified the parties never spoke on the phone, exchanged about 15 texts messages, and communicated mostly through Facebook Messenger. The parties ended contact in May 2016 after Bujdoso "abruptly asked [Lenington] to leave." She was "hostile," but he did not know why. She told him to stop contacting her but later sent him messages, and he responded. He learned from messages Bujdoso sent to him that she saw an online political argument he had with "somebody she looked up to."

¶ 24    Lenington recognized the Facebook picture attached to the second amended petition. He acknowledged that, in late October 2020, he spray-painted a toy gun to use in his video and posted a photograph of it with the caption, "Spray painting a toy gun *** outside in Downtown Chicago. Not the chillest thing I've ever done by far. I wonder what this is for??"

¶ 25    Lenington also acknowledged the exchange of messages shown to Kwaselow and that he mentioned Bujdoso by name. He claimed that he referred to Bujdoso after Kwaselow mentioned her. He denied writing that he "catfished" Bujdoso, maintaining that his message referring to "catfishing" and his next message mentioning Bujdoso were two different threads of conversation,

with the latter not a response to the earlier. He also denied writing that Bujdoso falsely accused him of sexual assault, adding that a "lot of people were making that claim."

¶ 26    Lenington admitted to making and posting in October 2020 a video titled "Weaponized Feminism, Accused of Sexual Assault Out Of Thin Air," played in court. The record on appeal does not include this video or the video discussed in ¶ 27. He acknowledged discussing in the video an unnamed woman allegedly abused by a friend but denied it meant Bujdoso.

¶ 27    Lenington admitted making and posting online another video, titled "Women in Comedy, False Accusation, A Halloween Special," also played in court. Lenington admitted that the video depicted fictional but graphic violence in which three women characters played by Lenington are shot, and Lenington shoots himself. One character was named Clarissa, which rhymes with Bujdoso's first name, and the other two women characters were named Tina Calm and J.C. Lenington was aware of Palm and Stockwell online, but he denied meeting either. He "made those names for my own amusement based on what I was wondering." While Clarissa in the video had blue or purple hair, he denied knowing that Bujdoso's hair had been blue or purple, adding that she was blond when he met her and at the hearing.

¶ 28    Lenington admitted mailing Bujdoso copies of documents in the order of protection proceedings when he knew he was prohibited from contacting her.

¶ 29    On cross-examination, Lenington denied sending videos to Bujdoso or "tag[ging] her on any social media" as she "had been blocked from my social media for years."

¶ 30    Bujdoso testified that she and Lenington were acquainted "[t]hrough the Chicago comedy scene" in spring 2016. As they were both comedians working multiple "open mic" shows weekly, they came into frequent contact and had mutual acquaintances. Bujdoso testified she and

Lenington were in a dating relationship and, during a three or four month period in early 2016, they communicated almost daily through "constant texts and constant Facebook [messages]." She said Lenington repeatedly asked her to go out and to meet up with him and asked her how she was feeling. "Things that you would do if you're dating someone."

¶ 31    Bujdoso identified a copy of their online correspondence from March 2016, in which he wrote in part, "I was thinking about you earlier. Wanted to come visit you at the bar, but I'm actually interested in getting dinner sometime. Are you single?" She wrote him that she was single and "would love to have dinner" and "get to know you better." When he suggested a restaurant on a night, she declined but told him she was "very interested." She believed he was asking her on a date. In early April 2016, Lenington wrote, "you feel better? Let's do something." Bujdoso inferred Lenington again was asking for a date. They communicated regularly, with romantic intent, as "[w]e were both interested in each other."

¶ 32    The parties went on a date in May 2016, but "it did not work out" because she learned during their date that they were different people with different beliefs, including that he was "not a feminist." She had told some of her friends that she was interested in Lenington, and they had gone on a date. Sometime after the date, Bujdoso told him she was no longer interested in a relationship. Specifically, she sent him a message on May 23, 2016, stating, "Do not contact me." When asked what prompted that message, she explained that late one evening, Lenington went to the bar where she worked and kept trying to engage her in conversation while she was trying to close the bar. She told him it was time to go, and he became "very upset" because others –bar employees – were not leaving. Bujdoso had to escort Lenington from the bar, which banned him from returning. His behavior caused her to no longer have a romantic interest.

¶ 33    Shortly after this incident, Bujdoso was at an "open mic" at a coffee shop when she encountered Lenington, who was smoking outside. "He grabbed me by the arm. I pulled away. I went back inside to let people know what had happened, and then I left." That was the last time the parties spoke "directly." Bujdoso gave up comedy in 2017, and Lenington was one of the reasons, as she did not want to "run into" him or have him attend one of her shows.

¶ 34    In early November 2020, Bujdoso learned of Lenington's online video, clarifying that she meant the "Women in Comedy." The video was discussed online by the comedy community, and she heard from Palm and Stockwell, who were in the video. Bujdoso believed that the character Clarissa depicted her, while Palm and Stockwell were depicted by the characters Tina and J.C. She believed Clarissa represented her not just because of the rhyming name but because the character referenced matters between the parties, including the incident with Lenington at the bar.

¶ 35    Bujdoso described the video as Clarissa starting rumors about Lenington, who shot himself in the head. He then shot each of the other characters in the back of the head before dismembering the women characters as he yelled, "I'm not a mass shooter. I'm not a rapist. I don't make women uncomfortable. I'm not a predator." He ends the video toasting champagne and laughing. Bujdoso explained that Clarissa spreading rumors was significant because Lenington blamed her for being ostracized in the "comedy scene" when she described their date to others.

¶ 36    Due to seeing the video, Bujdoso feared for her safety. She "was not the same person," had nightmares and panic attacks, and was afraid to go outside without having someone on the phone. She filed a police report the day after seeing the video and filed her petition for an order of protection a short time later. Stockwell informed her of Lenington's Facebook picture with a gun, which she believed referred to her.

¶ 37    After that, she learned from Palm of Lenington's "Weaponized Feminism" video. Bujdoso believed Lenington referred to her in the video, as he mentioned their date and the incident at the bar where she removed him, as well as a radio interview in which she discussed having been raped in 2005. Bujdoso also learned from Kwaselow about the online conversation he had with Lenington, in which Lenington twice mentioned her and said she had a "bogus sexual assault claim." In addition, Bujdoso was concerned given Lenington's online post in February 2020 discussing his "struggle with mental health issues, suicide ideations, his fear of having a psychological breakdown."

¶ 38    In December 2020, after Lenington received notice of the emergency order of protection, he posted another video referencing Bujdoso. He wore the same wig he wore as Clarissa in the earlier video and peeked around a corner holding an axe, saying, "A feminist might kill you." The wig, "lavender, silvery purple," was reminiscent of Bujdoso's hair color for four years. She believed Lenington made the new video to scare her. She informed her attorney and made a police report of a violation of the order of protection.

¶ 39    On cross-examination, Bujdoso testified that she did not know if Lenington ever owned a firearm. When asked if the parties met in person from March to May of 2016, Bujdoso answered that they "ran into each other" but could not recall when. Bujdoso reiterated that the parties went on one date before their "final interaction" in May 2016. On redirect examination, she again said she believed she and Lenington had a dating relationship and had communicated frequently on "[m]any days a week" leading up to the date, and he repeatedly asked her to meet.

¶ 40    Lenington testified as his own witness under the court's examination as he was *pro se*. He first met Bujdoso in March 2016 while hosting an "open mic," and Bujdoso was one of 50

comedians performing. Lenington introduced her performance, and later in the evening, they chatted. He mentioned that he was a comedian, and she mentioned working and performing comedy at another bar. They did not exchange contact information, but when Lenington sent a comedy video to about 20 to 30 people, including Bujdoso, she messaged him. They discussed comedy "like a conversation I would have with a lot of people who do comedy." Without him asking, she gave him her telephone number. While they discussed going to dinner, they did not go to dinner. They "never met outside of her bartending and me performing."

¶ 41   Lenington went twice to the bar where Bujdoso worked. The first time, in April 2016, he did not perform as there was not a show, but he "went there to kind of check out the place." He saw Bujdoso bartending and spoke with her "[s]poradically" as he sat at the bar for about 90 minutes to two hours. He denied anything significant happened. He messaged her the next day that he had fun and liked her bar but received no reply. Some weeks later, he messaged her again to ask if she worked the following Saturday, and she replied she did. In early May 2016, he texted her that he "meant to come see [her] the other night, but *** got sidetracked."

¶ 42   The parties saw each other for the final time in May 2016 at the bar where she worked. He participated in the "open mic." The day before, he texted her to determine whether her bar still had comedy shows, which she confirmed. When he arrived, he signed up with the host for the "open mic" and waited his turn, interacting with Bujdoso to order drinks. After his turn, he "hung around" with the other comedians and ordered drinks from Bujdoso until she approached him and "abruptly" told him to leave. Though others were present, she told only Lenington to go because, he surmised, she overheard a conversation in which he said something she did not like. As the bar was closing, he left. Lenington denied encountering Bujdoso in a coffee shop the next day. He

acknowledged inquiring if she was single when he asked her to dinner. The parties' last communication was in July 2016.

¶ 43    Regarding his Halloween video, Lenington testified that it was about himself and "a group of people with a political affiliation in the social justice ideology in the comedy community." When asked if that group included Bujdoso, he replied that "[s]he has since identified with the behaviors in the video" but "[s]he was not in my mind when I created" the video. The character name Clarissa rhymed with "many people," including Bujdoso but also a blue-haired bartender named Marissa. The video was not meant as a threat, and he did not post it with the goal of Bujdoso viewing it.

¶ 44    Bujdoso testified as Lenington's witness that, when he asked her to dinner, and she expressed interest, she wrote that she was "focusing on her career," and he wrote he "was not looking for anything serious."

¶ 45    On July 19, 2022, the court issued a two-year plenary order of protection against Lenington, directing him to not physically abuse, harass, stalk, or interfere with Bujdoso's personal liberty, to stay away from her, including not going to her workplace, and to have no contact with her "including through third parties and social media." The court did not order Lenington to undergo counseling or surrender firearms nor assess Lenington attorney's fees or costs. The court found Bujdoso credible and Lenington not credible.

¶ 46    The court held that the parties had a dating relationship based on "approximately 75 days of communication" through text messages, telephone, and Facebook Messenger, in which Lenington "was initiating a desire to have more than a professional relationship" by asking if Bujdoso was single and whether she wanted to go out for dinner, then doing so. The court also

found that Bujdoso and Lenington went on two additional dates when he went to her workplace and stayed past the time for regular customers. The parties communicated until Bujdoso told Lenington not to contact her. The court concluded that Lenington's conduct after the relationship ended constituted harassment under the Act and that Bujdoso presented evidence of physical abuse, namely when Lenington grabbed her arm.

¶ 47                                    Analysis

¶ 48     Lenington contends the parties were not in a dating relationship under the Act.

¶ 49     Before turning to the merits, we address two threshold issues. Lenington contends the court erred "by facilitating the exchange of home and work addresses without parties' prior knowledge [of] each other's whereabouts." Except for a bare citation to the Act, Lenington does not support this contention with legal authority. Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires a party to include in its appellate brief "[a]rgument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on," with the consequence that "[p]oints not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." We find this contention forfeited.

¶ 50     Bujdoso contends Lenington waived appellate review because his brief does not comply with  Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) by failing to cite to the common law record and authorities that support his arguments.

¶ 51     The rules of procedure for appellate briefs are rules and not suggestions. *Longo Realty v. Menard, Inc.*, 2016 IL App (1st) 151231, ¶ 18. 475. Where an appellant's brief contains numerous Rule 341 violations and impedes review, we may exercise our discretion, striking the brief and dismissing the appeal. See *Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 38 (citing *Kic v.*

*Bianucci*, 2011 IL App (1st) 100622, ¶ 23) (failure to follow Rule 341 may result in forfeiture of consideration of issues on appeal). *Pro se* status does not relieve a party of the obligation to comply with the appellate practice rules. *Fryzel v. Miller*, 2014 IL App (1st) 120597, ¶ 26.

¶ 52 Lenington's brief violates Illinois Supreme Court Rule 341(h)(7) (eff. July 1, 2020). Nonetheless, the deficiencies are not so flagrant to hinder our review because the issues are straightforward. See *Hall v. Naper Gold Hospitality, LLC*, 2012 IL App (2d) 111151, ¶ 15 (we will strike brief only when Rule violations hinder effective review).

¶ 53                                     Standard of Review

¶ 54 Bujdoso argues that whether the parties were in a dating relationship should be reviewed under a manifest weight of the evidence standard. Lenington relies on both *de novo* and manifest weight of the evidence standards. The manifest weight standard applies when a "case involves the application of the Act to disputed facts." *J.M. v. Briseno*, 2011 IL App (1st) 091073, ¶ 39. We agree that manifest weight is the applicable standard as the facts are disputed.

¶ 55 The Act protects persons from "physical abuse, harassment, intimidation of a dependent, interference with personal liberty or willful deprivation" by "a family or household member." 750 ILCS 60/103(1), 201(a)(i) (West 2020). The Act defines a "[f]amily or household member" to include "persons who have or have had a dating or engagement relationship," with the proviso that "neither a casual acquaintanceship nor ordinary fraternization between 2 individuals in business or social contexts shall be deemed to constitute a dating relationship." *Id.* § 103(6).

¶ 56 The Act does not define "dating relationship" but Lenington cites *Alison C. v. Westcott*, 343 Ill. App. 3d 648, 652-53 (2003), to support his contention that he and Bujdoso were not in a "dating relationship" because they went out on one date. In *Alison C.*, the appellate court held that

"the Illinois legislature intended for a 'dating relationship' under section 103(6) of the Act to refer to a serious courtship" or "relationship that was more serious and intimate than casual," so that one date could not establish a "dating relationship." Lenington contends he and Bujdoso went on one date and, thus, were not in a dating relationship under the *Alison C.* holding. We disagree.

¶ 57    Notably, the trial court found that Bujdoso and Lenington went on three dates, not one. That finding is supported by the manifest weight of the evidence, which shows that after communicating with Bujdoso and confirming that she was working, he went to the bar where she worked and stayed well after patrons. Thus, the facts here and in *Alison C.* are not analogous.

¶ 58    More significantly, *Alison C.* was decided more than 20 years ago before Facebook or its Messenger application existed, and text messaging was as ubiquitous as today. The current online nature of romantic relationships makes those communications almost as significant as the parties' in-person dates in assessing whether a "serious courtship."

¶ 59    The changing nature of a "dating relationship," was addressed in *C.C. v. J.A.H.*, 463 N.J. Super. 419 (2020), where the New Jersey appellate court found a "dating relationship" under that state's Prevention of Domestic Violence Act applied to a couple who never had a "traditional in-person 'date' '' but who had in-person conversations at the gym and exchanged hundreds of texts messages. *Id*. at 424. The court recognized "dating" as "a loose concept undoubtedly defined differently by members of different socio-economic groups and from one generation to the next" and advised judges "consider the parties' own understanding of their relationship as colored by" those factors. *Id*. at 429-30 (quoting *J.S. v. J.F.*, 410 N.J. Super. 611, 614 (App. Div. 2009)).

¶ 60    In addition to considering generational changes in what constitutes a "dating relationship," courts must also view the facts through the prism of the State's strong public policy against

domestic violence. The primary purpose of the Act "aid[ing] victims of domestic violence and to prevent further violence" (*In re Marriage of Young*, 2013 IL App (2d) 121196, ¶ 20) is not served by narrowly interpreting what constitutes a dating relationship.

¶ 61    As the trial court noted, Lenington and Bujdoso communicated for nearly three months via text message, Facebook Messenger, and telephone during which Lenington expressed a desire to have a romantic rather than a professional relationship with Bujdoso and she expressed a similar interest. Lenington asked if she was single and whether she wanted to go on a date with him. In response, Bujdoso gave him her phone number. Then, as the trial court noted, they went on three dates and continued to communicate in a manner the trial court found to be romantic and not professional. Bujdoso testified she had daily communications with Lenington, denoting a dating relationship. Their communications continued until they broke up after an altercation at the bar and in a Facebook Messaging exchange, in which she told him not to contact her again.

¶ 62    Lenington and Bujdoso's nearly three month relationship in person and through messages and her reciprocal interest constitutes a "serious courtship" under the Act. Thus, the finding that the parties had a dating relationship was not against the manifest weight of the evidence.

¶ 63    Finally, Lenington asks us to refer the case for prosecution for "perjury and abuse of process repercussions." We decline, noting that the trial court found Lenington's testimony not credible and Bujdoso's testimony credible.

¶ 64    Affirmed.